AMITY LEATHER PRODUCTS CO., PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2014–81, 8056–82.    Filed May 17, 1984.

---

*Robert A. Schnur*, for the petitioner.
*Edward J. Roepsch*, for the respondent.

COHEN, *Judge*: In statutory notices of deficiency dated December 23, 1980, in docket No. 2014–81, and April 2, 1982, in docket No. 8056–82, respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Docket No. | TYE Dec. 31— | Deficiency |
| --- | --- | --- |
| 2014–81........... | 1972 | $46,678.05 |
| | 1974 | 227,555.41 |
| | 1975 | 96,539.30 |
| 8056–82........... | 1977 | 37,924.00 |
| | 1978 | 38,366.00 |

By agreement of the parties and by order of the Court, these cases were consolidated for purposes of trial, briefing, and opinion. After concessions, the issues for determination are: (1) Whether petitioner, a manufacturer of leather products who used the last-in, first-out (LIFO) inventory method, properly included both products manufactured in its own facilities and related products acquired from its wholly owned subsidiaries in the same "natural business unit" pool within the meaning of section 1.472–8(b)(2), Income Tax Regs.; and (2) whether petitioner, who in 1975 liquidated a subsidiary and created a new division in Puerto Rico, properly treated the leather goods produced by that division as a new "item" in its inventory pool within the meaning of section 1.472–8(e)(2)(iii), Income Tax Regs.

### FINDINGS OF FACT

The operative facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Amity Leather Products Co. (petitioner), a Wisconsin corporation, maintained its principal place of business in West Bend, Wis., at the time it filed its petitions in these consolidated cases. Petitioner timely filed income tax returns for its taxable years ended December 31, 1972, through December 31,

1978, with the Internal Revenue Service Center in Kansas City, Mo.

At all times relevant herein, petitioner was in the business of designing, manufacturing, and selling personal leather goods. The principal manufacturing facility was in West Bend, Wis. Petitioner also operated a manufacturing facility in Albuquerque, New Mex.; a leather finishing plant in West Bend; distribution centers in West Bend, Albuquerque, and (beginning in April 1978) in Goldsboro, N.C.; and a retail outlet store in West Bend. Each of these facilities maintained separate records, and each was accounted for as a separate cost center. The majority of the leather products, which included billfolds, key cases, and travel cases, were marketed under the trade names "Amity" and "Rolfs." The balance of these products were sold to Sears, Roebuck & Co., and carried no trade name.

In addition to the personal leather goods manufactured domestically, petitioner acquired and marketed identical goods from three related Puerto Rican corporations. During the years in issue, these goods were limited to men's billfolds and men's key cases.

As of January 1, 1972, over 95 percent of petitioner's outstanding stock was owned by Thomas J. Rolfs, Robert T. Rolfs, and related family trusts. The Rolfs also owned all of the outstanding stock of two Puerto Rican corporations, Alpco of Puerto Rico, Inc. (APR), and Alpco #2, Inc. (Alpco #2). A third Puerto Rican corporation, Sanlo, Inc. (Sanlo), was a wholly owned subsidiary of Alpco #2. Each of these Puerto Rican corporations was organized and operated under the laws of the Commonwealth of Puerto Rico.

On August 24, 1972, APR, Alpco #2, and Sanlo were each reorganized into Delaware corporations. APR and Alpco #2 changed their names to Alpco, Inc., and Tomro Leather Products, Inc. (Tomro), respectively. As a result of these reorganizations, Alpco, Inc., and Tomro became wholly owned subsidiaries of petitioner. Sanlo continued to be a wholly owned subsidiary of Tomro (formerly Alpco #2). Alpco, Inc., Tomro, and Sanlo (the Puerto Rican affiliates) continued to operate in Puerto Rico.

On September 23, 1975, Alpco, Inc., was dissolved, and all of its assets and liabilities were transferred to, and assumed by,

petitioner. The operations of Alpco, Inc., were thereafter performed by a separate Puerto Rican division of petitioner (Alpco) in exactly the same manner as before the dissolution.

During the relevant years, the operations of the Puerto Rican affiliates were interrelated and conducted in a single industrial building in San Lorenzo, P.R. Prior to January 1, 1974, Alpco, Inc., purchased all finished leather needed for the Puerto Rican operations; approximately 25 percent was purchased from petitioner and the balance from outside suppliers. Alpco, Inc., cut the leather into appropriate configurations and sorted it into job boxes. The cut leather, which was still owned by Alpco, Inc., was then subassembled by Tomro. After subassembly, Alpco, Inc., sold approximately one-third of the subassembled goods to Tomro, a similar amount to Sanlo, and retained the balance. Each of the affiliates then performed a final assembly procedure on these goods. Following final assembly, the finished goods were packaged by Sanlo. Except for a few goods purchased by the employees of the affiliates for personal use, all of the finished goods produced by the affiliates (the Puerto Rican goods) were sold to petitioner f.o.b. San Lorenzo.

The intercompany pricing for these transactions was as follows: Alpco, Inc., invoiced Tomro and Sanlo for its costs (direct and indirect) in obtaining, cutting, and sorting the leather; no markup for profit was included. Tomro invoiced Alpco, Inc., and Sanlo for its costs (direct and indirect) incurred in subassembling the products for Alpco, Inc., and Sanlo. Tomro similarly included no markup for profit. Alpco, Inc., Sanlo, and Tomro each invoiced petitioner for the goods sold to petitioner at a price that included all costs incurred by them, plus a markup for profit.

Upon receiving the Puerto Rican goods at its distribution centers, petitioner placed plastic lids on the cardboard boxes of some of the goods. On other goods, petitioner inserted cardboard displays and placed the goods in specially labeled boxes. Occasionally, due to a lack of materials in Puerto Rico, petitioner also placed inserts, wings, and sleeves in some of the goods. The vast majority of the Puerto Rican goods, however, were complete and ready for resale. Neither the Puerto Rican goods nor the goods manufactured by petitioner in the United States carried markings or other identification on the goods

themselves or on the boxes that indicated where they were manufactured. Petitioner did maintain perpetual inventory records, however, from which the source of the finished goods could be determined.

Beginning on January 1, 1974, and prior to September 23, 1975, the task of purchasing all finished leather for the Puerto Rican affiliates was assumed by Tomro. Alpco, Inc., continued to cut and sort the leather, but title to the leather remained in Tomro. As in the prior period, subassembly was performed by Tomro, who then sold approximately one-third of the subassembled goods to Alpco, Inc., and one-third to Sanlo. Each of the affiliates performed final assembly, Sanlo performed the packaging, and the finished goods were sold by the affiliates to petitioner as in the prior period.

After the dissolution of Alpco, Inc., in September 1975, the Puerto Rican activities were conducted in exactly the same manner as immediately prior to the dissolution, except that the activities previously carried on by Alpco, Inc., were thereafter performed by petitioner through its Puerto Rican division, Alpco. Petitioner, through its Alpco division, was able to manufacture billfolds in Puerto Rico at substantially less expense than those manufactured domestically.

Petitioner exercised a great deal of control over the operations of the Puerto Rican affiliates. The decision as to whether a particular product line would be produced in Puerto Rico, the United States, or both, was made by petitioner on an annual basis. Additionally, the sales forecasting, design engineering, product development, manufacturing engineering, and production scheduling for all goods produced by the Puerto Rican affiliates were conducted by, or under, the supervision of petitioner.

Each of the Puerto Rican affiliates maintained separate books and records from those of petitioner including its own inventory and production records. All of these corporations used the accrual basis of accounting for financial reporting and tax purposes. The Puerto Rican affiliates each filed Federal income tax returns for the years 1972 through 1978 with the Internal Revenue Service Center in Philadelphia, Pa.; they did not file consolidated returns with petitioner.

Prior to the taxable year ended December 31, 1973, petitioner utilized the first-in, first-out (FIFO), lower of cost or market,

method of accounting for its inventory, both for financial reporting and tax purposes. With its 1973 tax return, petitioner filed Form 970, Application to Use LIFO Inventory Method. On the application, petitioner elected the "dollar-value" method of pricing its LIFO inventories, the "double extension" method of computing the value of the dollar-value pool, and the "most recent purchases" method of valuing increments. Further, petitioner elected to utilize a single "natural business unit" (hereinafter NBU) LIFO pool, which was comprised of its total inventory investment. This single NBU LIFO pool included, inter alia, finished leather goods manufactured by petitioner and finished leather goods purchased from the Puerto Rican affiliates.

For the taxable year ended December 31, 1975, and for subsequent years, petitioner treated the men's billfolds produced by the Alpco division as a new "item" in its single NBU LIFO pool, and it reconstructed the base-year cost of the billfolds.

In his notices of deficiency, respondent determined, inter alia, (1) that petitioner improperly grouped in a single NBU LIFO pool the leather goods manufactured by petitioner and the leather goods acquired from the Puerto Rican affiliates, and (2) that petitioner improperly treated the men's billfolds produced by the Alpco division as a new item in its LIFO pool.

OPINION

*Principles of Inventory Valuation*

The hallmark of inventory accounting for tax purposes is the clear reflection of income. Sec. 471.[1] Section 472 permits any taxpayer to adopt the LIFO inventory method. Under LIFO, it is assumed for a given year that the most recent purchases were the first sold and that the goods on hand at the end of the year are considered to be the earliest acquired. *Klein Chocolate Co. v. Commissioner*, 32 T.C. 437, 449 (1959). During a period of rising costs, use of the LIFO method in most cases results in lower taxes because the valuation of ending inventory is less (consisting of the earlier, less expensive items)

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

and thus cost of goods sold is greater. The theory behind LIFO is that income may be more accurately determined by matching current costs against current revenues, thereby eliminating from earnings any artificial profits resulting from inflationary increases in inventory costs. *Fox Chevrolet, Inc. v. Commissioner*, 76 T.C. 708, 722 (1981).

Section 472(a) provides that "The change to, and the use of, * * * [LIFO] shall be in accordance with such regulations as the Secretary may prescribe as necessary in order that the use of such method may clearly reflect income." The LIFO regulations are legislative regulations and must be applied unless unreasonable and plainly inconsistent with the statute they implement. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); *Sanford v. Commissioner*, 50 T.C. 823, 832 (1968), affd. 412 F.2d 201 (2d Cir. 1969). See also *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979), affg. 563 F.2d 861 (7th Cir. 1977), affg. 64 T.C. 154 (1975).

Petitioner elected to utilize the "dollar-value" method of pricing LIFO inventories. The dollar-value method measures increases or decreases in terms of total dollars rather than in terms of physical units. Thus, to determine whether there has been an increase or decrease in the inventory during the year, the ending inventory is valued in terms of total dollars that are equivalent in value to the dollars used to value the beginning inventory. *Wendle Ford Sales, Inc. v. Commissioner*, 72 T.C. 447, 452 (1979); *Hutzler Brothers Co. v. Commissioner*, 8 T.C. 14 (1947).

Fundamental to the operation of the dollar-value method is the concept of "pooling." It is the fluctuation in the value of a pool that determines the increase or decrease in cost of goods sold. *Richardson Investments, Inc. v. Commissioner*, 76 T.C. 736, 745 (1981).

The regulations contain four different methods of computing LIFO value for dollar-value pools. In this connection, petitioner properly employed the double-extension method as provided in section 1.472–8(e)(2), Income Tax Regs. The use of that method may be described as follows:

Under the double-extension method, the benchmark used to compute the cost of the ending inventory in a pool is the "base-year cost" of each item in the pool. The "base-year cost" of an item is generally the cost of the item determined as of the beginning of the taxable year for which the LIFO

method is first adopted, i.e., the base year, and, in the case of an item entering a pool for the first time in a year subsequent to the base year, the current cost of that item. In accordance with the double-extension method, the base-year cost of each item within a pool is aggregated, and compared with the beginning inventory of the pool valued at base-year cost. If the value of the ending inventory at base-year cost does not exceed the beginning inventory using base-year cost, the closing inventory is equal to the inventory on hand at yearend, valued at base-year cost. If, however, the ending inventory, valued at base-year cost, exceeds the value of the beginning inventory at base-year cost, the ending inventory is equal to the sum of the base-year cost of the beginning inventory plus a "layer of increment" valued at current-year cost computed under a formula set forth in the regulations. *Hutzler Brothers Co. v. Commissioner, supra*; sec. 1.472–8 (e) (2) (iv), Income Tax Regs. [*Wendle Ford Sales, Inc. v. Commissioner, supra* at 453, 454. Fn. ref. omitted.]

The formula for valuing a layer of increment (hereinafter the price index) is obtained by dividing the entire ending inventory valued at current-year cost by the entire ending inventory valued at base-year cost. After the LIFO value of the increment is determined, it is added to the LIFO value of the beginning inventory in order to obtain the total ending LIFO inventory value of the pool.

The nature of "items" in a pool must be similar enough to allow a comparison between ending inventory and base-year inventory. Because the change in the price of an item determines the price index and the index affects the computation of increments or decrements in the LIFO inventory, the definition and scope of an item are extremely important to the clear reflection of income. If factors other than inflation enter into the cost of inventory items, a reliable index cannot be computed. For example, if a taxpayer's inventory experiences mix changes that result in the substitution of less expensive goods for more expensive goods, the treatment of those goods as a single item increases taxable income. This occurs because any inflation in the cost of an item is offset by the reduction in cost resulting from the shift to less expensive goods. Conversely, if changes in mix of the inventory result in the substitution of more expensive goods for less expensive goods, the treatment of those goods as a single item decreases taxable income because the increase in inventory costs is eliminated from the LIFO cost of the goods as if such cost increase represented inflation.

A narrower definition of an item within a pool will generally lead to a more accurate measure of inflation (i.e., price index) and thereby lead to a clearer reflection of income. At the same time, the method of inventory accounting must be administratively feasible and not unduly burdensome from the standpoint of each of the parties. Within limits of reasonableness, regulations governing LIFO inventory accounting have to be applicable across the board. Whether they achieve the best result in a particular fact situation is not controlling.

### Petitioner's Inventory Pools

The first issue for resolution is whether petitioner properly included in a single LIFO inventory pool goods manufactured in its own facilities and finished goods acquired from its wholly owned subsidiaries.

The principles for establishing pools are set forth in section 1.472–8 (b) and (c), Income Tax Regs., for "manufacturers and processors" and "wholesalers and retailers," respectively. The pertinent part of those regulations provides:

(b) *Principles for establishing pools of manufacturers and processors*—(1) *Natural business unit pools.* A pool shall consist of all items entering into the entire inventory investment for a natural business unit of a business enterprise * * * Where a manufacturer or processor is also engaged in the wholesaling or retailing of goods purchased from others, any pooling of the LIFO inventory of such purchased goods for the wholesaling or retailing operations shall be determined in accordance with the rules of paragraph (c) of this section.

(2) *Definition of natural business unit.* (i) Whether an enterprise is composed of more than one natural business unit is a matter of fact to be determined from all the circumstances. The natural business divisions adopted by the taxpayer for internal management purposes, the existence of separate and distinct production facilities and processes, and the maintenance of separate profit and loss records with respect to separate operations are important considerations in determining what is a business unit, unless such divisions, facilities, or accounting records are set up merely because of differences in geographical location. In the case of a manufacturer or processor, a natural business unit ordinarily consists of the entire productive activity of the enterprise within one product line or within two or more related product lines including (to the extent engaged in by the enterprise) the obtaining of materials, the processing of materials, and the selling of manufactured or processed goods. Thus, in the case of a manufacturer or processor, the maintenance and operation of a raw material warehouse does not generally constitute, of itself, a natural business unit. If the taxpayer maintains and operates a supplier unit the production of which is both sold

to others and transferred to a different unit of the taxpayer to be used as a component part of another product, the supplier unit will ordinarily constitute a separate and distinct natural business unit. * * * *Where a manufacturer or processor is also engaged in the wholesaling or retailing of goods purchased from others, the wholesaling or retailing operations with respect to such purchased goods shall not be considered a part of any manufacturing or processing unit.*

\* \* \* \* \* \* \*

(c) *Principles for establishing pools for wholesalers, retailers, etc.* Items of inventory in the hands of wholesalers, retailers, jobbers, and distributors shall be placed into pools by major lines, types, or classes of goods. * * * Where a wholesaler or retailer is also engaged in the manufacturing or processing of goods, the pooling of the LIFO inventory for the manufacturing or processing operations shall be determined in accordance with the rules of paragraph (b) of this section.

[Emphasis supplied.]

Respondent contends that petitioner was engaged in the business of manufacturing personal leather goods in the United States and in the business of wholesaling or retailing personal leather goods acquired from the Puerto Rican affiliates. Based on this contention, respondent argues that the above-cited regulations explicitly require petitioner to maintain one inventory pool for the manufactured goods and a separate pool for the goods acquired from the Puerto Rican affiliates. Petitioner, on the other hand, argues (1) that all of its operations constituted a single natural business unit within the meaning of section 1.472–8(b)(2), Income Tax Regs.; (2) that its use of a single inventory pool was in accordance with generally accepted accounting principles (GAAP); and (3) that it consistently applied its pooling method. Petitioner concludes that it was entitled under the regulations to use a single pool for its operations as elected on its Form 970 and as reported on its tax returns.

The fact that an accounting method is in accordance with GAAP does not establish that the method clearly reflects income under the tax law. *Thor Power Tool Co. v. Commissioner*, 64 T.C. 154, 166 (1975), affd. 563 F.2d 861 (7th Cir. 1977), affd. 439 U.S. 522 (1979). Similarly, the fact that an accounting method has been consistently applied does not validate that method where it fails to clearly reflect income. *Coors v. Commissioner*, 60 T.C. 368, 395 (1973), affd. 519 F.2d 1280 (10th Cir. 1975).

Petitioner does not challenge the validity of section 1.472–8(b)(2), Income Tax Regs., which defines "natural business unit," but asserts that it is ambiguous and advances several arguments as to why all of its operations were a single natural business unit. First, petitioner argues that it was engaged in the single trade or business of producing personal leather goods, emphasizing that the manufactured goods and the Puerto Rican goods were a related product line, that the goods were sold through a unified marketing structure, and that no distinction was made between the manufactured goods and the Puerto Rican goods. Because its operations were a single trade or business, reasons petitioner, they constituted a single natural business unit.

Petitioner is valiantly trying to avoid the consequences of the regulation by suggesting that it is ambiguous. We conclude that the language is not ambiguous and that petitioner is merely trying to engraft exceptions not allowed by that language. Petitioner would have us conclude that an exception to this language exists where a manufacturer of goods is also engaged in the wholesaling of identical goods. Perhaps more detailed regulations could have adopted petitioner's distinctions, but these did not. The language requiring that operations with respect to purchased goods be considered separate from the manufacturing process of a dual-function entity is understandable and, in the context of the whole of the regulation, requires that separate pools be maintained for each function. The regulation is reasonable and cannot be disregarded.

Petitioner next contends that because of the degree of control exercised by it over the operations of the Puerto Rican affiliates, it was essentially the manufacturer of the Puerto Rican goods. The term "manufacturer" means "One who by labor, art, or skill transforms raw material into some kind of a finished product or article of trade." Black's Law Dictionary 870 (rev. 5th ed. 1979). The term "wholesaler," on the other hand, refers to "One who buys in comparatively large quantities, and then resells, usually in smaller quantities, but never to the ultimate consumer." Black's Law Dictionary 1432 (rev. 5th ed. 1979).

Petitioner's degree of control over the operations of the Puerto Rican affiliates was extensive. It included conducting

or supervising sales forecasting, design engineering, and production scheduling for all goods produced by the affiliates. This control, however, falls far short of the actual transformation of raw materials into finished leather goods. The affiliates were separate corporate entities. They maintained separate books and records and filed separate tax returns. Prior to shipment of the finished goods, title to the goods, including raw materials and work in process, was possessed, and risk of loss was borne by, the affiliates. The affiliates reported these inventories on their tax returns. At the time of shipment, the affiliates invoiced petitioner for the goods at a price that included their cost plus a markup. Under these circumstances, the actions of the affiliates cannot be attributed to petitioner, and petitioner's degree of participation in the operations of the affiliates was not equivalent to manufacturing the Puerto Rican goods.

Petitioner maintains that it would be considered the manufacturer of the Puerto Rican goods in other tax contexts, citing *Charles Peckat Manufacturing Co. v. Jarecki*, 196 F.2d 849 (7th Cir. 1952), and urges us to conclude that it was a manufacturer of those goods for LIFO purposes. The facts and issue in *Charles Peckat Manufacturing Co. v. Jarecki, supra*, are distinguishable from those presently before us. In that case, the taxpayer, who owned a patent on a certain bracket for automobile visors, contracted with an independent machine shop to fabricate the product. The entire output of the machine shop was required to be sold to the taxpayer, and the machine shop never held a proprietary interest in the completed product. The issue before the court was whether the taxpayer was the manufacturer of the product and thereby subject to the excise tax law. The fact that petitioner may be considered a manufacturer of the Puerto Rican goods in such other tax context is not controlling for LIFO purposes because the purpose of characterizing the entity as a manufacturer differs substantially in the two types of cases. The question here is whether the process followed by petitioner with respect to the Puerto Rican goods is distinguishable for inventory accounting purposes from the process involved in the domestic manufacture of goods. We conclude that it is.

Petitioner also argues that it should be considered a manufacturer of the Puerto Rican goods because of the work

performed by it on those goods. Prior to the dissolution of Alpco, Inc., on September 23, 1975, the work performed on those goods was generally limited to placing a plastic lid on a cardboard box or inserting a cardboard display and placing the goods in specially labeled boxes. Occasionally, due to a lack of materials in Puerto Rico, petitioner also placed inserts, wings, and sleeves in the goods. After the dissolution of Alpco, Inc., petitioner, through its Puerto Rican division (Alpco), performed an additional function on goods acquired from Tomro and Sanlo. Alpco cut the finished leather into appropriate configurations and sorted it into job boxes. Alpco did not, however, possess title to, or bear the risk of loss, of this leather; nor did Alpco include this leather in its inventory. Although these functions performed by petitioner may have been beyond those performed by some wholesalers, they do not in themselves make petitioner a manufacturer of the Puerto Rican goods.

The purchase of the finished leather and other materials, the subassembly, the final assembly, and the packaging were all performed by Tomro, Sanlo, or prior to its dissolution, by Alpco, Inc. At all times, the title to the leather and materials was held by these companies, and these companies included them in their inventories. At the time that petitioner purchased the Puerto Rican goods, they were finished goods essentially ready for resale, rather than partially manufactured goods. Petitioner purchased these goods in quantities and then resold the goods in smaller quantities. Based on these facts and on the entire record, we conclude that petitioner was a wholesaler and not a manufacturer of the Puerto Rican goods.

Having concluded that petitioner was a wholesaler of the Puerto Rican goods, these operations may not be considered a part of their manufacturing business unit, and petitioner was required to maintain a separate inventory pool for these goods. Sec. 1.472–8(b)(2), Income Tax Regs. Therefore, respondent's determination as to this issue is sustained.

### Petitioner's Inventory Items

The second issue for resolution is whether petitioner properly treated the men's billfolds manufactured by the Alpco

division as a new item in its inventory pool and properly reconstructed a base-year cost therefor.

In the case of an "item" of inventory entering a pool for the first time subsequent to the first taxable year for which LIFO was adopted, the double-extension method requires that the base-year cost of the pool be adjusted to reflect the introduction of the new item into the pool. Specifically, section 1.472–8(e)(2)(iii), Income Tax Regs., provides:

> Under the double-extension method a base-year unit cost must be ascertained for each *item entering a pool for the first time* subsequent to the beginning of the base year. In such a case, the base-year unit cost of the entering item shall be the current-year cost of that item unless the taxpayer is able to reconstruct or otherwise establish a different cost. [Emphasis supplied.]

The parties differ as to the meaning of the term "item" in this regulation.

Respondent's position is that the Alpco division billfolds were not a new "item," and he concludes that petitioner's change of the base-year unit cost for an existing item was a change in accounting method for which the consent of the Commissioner was required under section 446(e). In support of his position, respondent asserts that (1) the billfolds produced by the Alpco division were indistinguishable from those produced in the United States and those produced by the Puerto Rican affiliates, (2) changes in cost to produce or acquire an item do not create a new item, and (3) petitioner had already selected as one item all men's billfolds, whether produced in the United States or in Puerto Rico.

Petitioner, on the other hand, contends that the Alpco division billfolds were a new item and that it was entitled to reconstruct the base-year unit cost of that item. This contention is based on petitioner's arguments that (1) the taxable year ended December 31, 1975, was the first time that its inventory included billfolds assembled in Puerto Rico by itself, (2) the cost to manufacture billfolds in Puerto Rico was substantially less than the cost to manufacture them in the United States, and (3) a narrower definition of the term "item" is preferable because it increases the accuracy of the price index. Petitioner concedes that if the Alpco division billfolds were not a new item, then it was not entitled to reconstruct its base-year cost without the consent of the Commissioner.

Unfortunately, neither the Code nor the regulations define the term "item" as it is used in section 1.472–8(e)(2)(iii),

Income Tax Regs. The first time that we were confronted with this problem, we held that in the case of a *retailer* of goods, an "item" refers to a finished product of inventory and not to its individual components. *Wendle Ford Sales, Inc. v. Commissioner, supra* at 455; see also *Fox Chevrolet, Inc. v. Commissioner, supra*. We are unaware, however, of any authority that defines that term as it applies to a manufacturer. Our task, therefore, is to view that term in the context of a manufacturing operation in a manner that most closely satisfies the purpose of maintaining inventories, i.e., the clear reflection of income. Sec. 471.

Respondent would require petitioner to treat both the billfolds manufactured by it in Puerto Rico and those manufactured in the United States as the same item. This method, however, would lead to an inaccurate measure of any inflation or deflation. The Puerto Rican billfolds cost substantially less than the domestic billfolds to manufacture. Respondent's method would result in the assumed or "constructive" substitution of less expensive goods for more expensive goods in the cost of goods sold computation, and any inflation in the cost of the domestic billfolds would be at least partially offset by the shift to the Puerto Rican billfolds in the LIFO valuation of the inventory. Further, because the ratio of billfolds manufactured in the United States in relation to billfolds manufactured in Puerto Rico in petitioner's inventory pool may change, and because it is likely that the rate of inflation in Puerto Rico may vary from the rate of inflation in the United States, respondent's method would continue to lead to an inaccurate measure of inflation in future years.

Petitioner's method, on the other hand, of treating the Alpco division billfolds as a separate item from the domestic billfolds is obviously a more narrow definition of the term "item." Under this approach, the impact of inflation on petitioner's inventory is more accurately eliminated, and its income is more clearly reflected. Petitioner is thus entitled to treat the Alpco division billfolds as a new item in 1975 under section 1.472–8(e)(2)(iii), Income Tax Regs.[2]

*Decisions will be entered under Rule 155.*

---

[2] Petitioner concedes that it improperly reconstructed the base-year cost of this item. The parties have agreed that the calculation of the proper base-year cost will be part of the Rule 155 computation.