UFE, Inc., Petitioner v. Commissioner of
Internal Revenue, Respondent

Docket No. 38480-86.        Filed June 22, 1989.

*David R. Brennan,* for the petitioner.
*Gordon L. Gidlund,* for the respondent.

Williams, *Judge:* The Commissioner determined a deficiency in petitioner's Federal income tax for the taxable year ending March 31, 1981, in the amount of $651,084. By amendment to answer, respondent asserts that an additional unspecified deficiency is due for the same taxable year.

The issues we must decide are (1) whether petitioner correctly included in its LIFO inventory pool the finished inventory that was purchased simultaneously with all the assets of an ongoing manufacturing business purchased by petitioner, (2) whether petitioner acquired intangible going-concern value, and (3) whether certain accounts receivable that petitioner purchased with the business were cash equivalents.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.

Petitioner is a corporation formed under the laws of Minnesota which maintained its principal office in Stillwater, Minnesota, at the time of filing the petition herein. Petitioner was incorporated on February 25, 1980, by Orville D. Johnson (Johnson), Robert W. Kaul (Kaul), and Richard Heath (Heath). On March 31, 1980, petitioner purchased substantially all of the assets of the thermoplastics division of Kroy Industries Inc. (Kroy), a publicly held corporation formed under the laws of Minnesota. All the disputes in this case arise out of this purchase.

Prior to March 31, 1980, Kroy comprised two divisions: the thermoplastics division and the graphic arts division. The thermoplastics division, doing business under the name UFE (UFE), was engaged in the manufacture and sale of precision-engineered, close-tolerance thermoplastic molds, called tools, and molded parts made from those tools to customers' specifications. The manufactured parts included gears, cams, connectors, or wheels related to the mechanical operation of equipment such as typewriters, office copiers, computers, telephones, cameras, and automobiles. UFE made the tool to the exact specifications of the customer's order and injected plastic into the tool to make the parts. The customer purchased the tool after inspection and approval of the parts. UFE kept possession of the tool to fill subsequent orders and to secure payment for orders. The bulk of UFE's business consisted of sales to manufacturers in the automobile industry, and UFE was affected by business cycles of the automobile industry.

Kroy's other division, the graphics division (Graphics), designed, manufactured, and sold graphics products, principally lettering systems and supplies, but also electric drafting erasers, sharpeners for mechanical pencils, transfer film, and other drafting supplies. Although Graphics commenced business operations in 1972, UFE supported it until it became profitable in 1977. Between 1977 and 1979, Graphics enjoyed rapid growth and success while UFE suffered from a decline in the automobile industry.

In 1979, Don Gustafson (Gustafson), Kroy's controlling shareholder, chief executive officer, and the chairman of the board of directors, decided that in order to continue to flourish and expand, Graphics would need a substantial

infusion of cash. Furthermore, Gustafson wanted to retire a $5 million debt. To raise the needed cash as well as to insulate Graphics from the cyclical nature of UFE's business, Gustafson decided that Kroy should sell UFE. After much discussion, some of which grew heated, the Kroy board of directors, which included persons who were not employed at Kroy, authorized Johnson and Kaul, then the President of UFE division and Vice President of Finance at Kroy, respectively, to solicit offers for the purchase of UFE. Gustafson pressed Johnson and Kaul to find a buyer quickly.

In attempting to sell UFE, Kroy never seriously contemplated a liquidation of individual assets. The board of directors was concerned for the welfare of the UFE employees and desired to sell the UFE business as a whole. Kroy received inquiries from two prospective purchasers. Kaul and Johnson arranged tours of the plants and explained UFE's lack of long-term contracts. The prospective purchasers made tentative offers in the approximate amounts of $7.5 million and $9 million, but neither made a firm offer in writing. Marks, an investment banking firm, considered purchasing UFE through a leveraged buyout, and inspected the plant and the books before deciding not to make an offer.

As Kaul negotiated to sell UFE, he began to consider an employee-backed purchase. Kaul, Johnson, and Heath, who managed UFE, decided to offer to buy UFE. In addition to serving as president of the UFE division, Johnson was a member of Kroy's board of directors. Heath was director of marketing of UFE. Based on their understanding that an appropriate purchase price for UFE should equal five or six times the division's annual earnings, Kaul, Johnson, and Heath made an offer of $11 million which they believed was fair and reasonable. By the time of sale, the purchase price had risen to $14,708,068.90 to reflect changes in then current accounts receivable, prepaid expenses, and book value of inventory.

In conjunction with the sale, Kroy obtained a fairness opinion letter from Douglas E. Johnson, an officer in the finance department of Dain Bosworth, a venture capital investment firm. In concluding that the purchase price was

fair, Douglas Johnson reviewed five publicly traded companies with comparable investment characteristics in similar businesses. He determined that the comparison companies were trading at price-to-earnings ratios between 5.8 and 6.8, while the purchase price offered for UFE of $14,708,068.90 reflected a price to earnings ratio between 6.9 and 7.7. In evaluating the fairness of the terms and the price, he did not consider the value of the individual assets that could be realized on liquidation. Dain Bosworth's fairness opinion letter was presented to the shareholders at a meeting in which they decided to accept the offer from Johnson, Kaul, and Heath. A pro forma balance sheet which was also submitted to the shareholders prior to the meeting, indicated that the book value of the assets of UFE division was $13,290,000 at the time of sale.

During the negotiations with Kroy, Johnson, Kaul, and Heath were represented by their own counsel. Kaul and Patrick J. Dirk (Dirk), Kroy's president at the time of the sale, specifically negotiated over the acquisition of the name of the division for use by petitioner and agreed to allocate $50,000 of the purchase price to the purchase of goodwill. Kroy also agreed to transfer UFE's lists of suppliers of raw materials, as well as its longstanding customer structure. Furthermore, 300 to 500 members of UFE's skilled work force, the entire sales force, and most of the management group were hired by petitioner. Although UFE's customer lists were transferred, petitioner did not succeed to any long-term sales contracts of Kroy's.

The offer was accepted and after incorporation, petitioner purchased substantially all of UFE's assets from Kroy in exchange for $14,708,068.90. Petitioner borrowed $10 million from the Prudential Insurance Co. to finance the purchase. Pursuant to the purchase agreement, Kaul, Johnson, Heath, and petitioner transferred to Kroy 85,000 shares of their 133,423 shares of Kroy common stock.

In organizing the petitioner's books, Kaul, petitioner's new vice president of administration, requested an appraisal of the purchased assets from the accounting firm of Peat, Marwick, Mitchell & Co. Contrary to expectations, the appraisal report determined that the aggregate value of the

purchased assets was $25,124,230.26 comprising the following asset values:

| Asset | Value |
| --- | --- |
| Accounts receivable | $4,651,783.00 |
| Raw materials | 3,270,181.00 |
| Work in progress | 1,979,176.26 |
| Finished inventory | 1,890,693.00 |
| Prepaid expenses | 57,030.00 |
| Land and buildings | 12,974,667.00 |
| ENM note | 250,000.00 |
| Cash | 700.00 |
| Goodwill | 50,000.00 |
| Total | 25,124,230.26 |

In preparing to enter the accounts receivable on the new corporate books, Earl R. Duckett (Duckett) evaluated the collectibility of each individual account. Duckett was petitioner's comptroller and had been employed at Kroy as comptroller for the UFE division. As comptroller of UFE, he had been responsible for collecting the accounts receivable, preparing the monthly accounts receivable reports, and recommending action relating to UFE's bad debts. Duckett determined that the customers whose accounts receivable had been transferred to petitioner from Kroy were, on the whole, large and successful companies including International Business Machines, Ford Motor Co., Polaroid, Xerox, and Maytag. The debt history showed that UFE division's accounts receivables usually were collected within 45 days and, in fact, 93.2 percent of the accounts receivable transferred from Kroy were collected within 60 days of the purchase date. In the 6 years preceding the year of sale, UFE had rarely written off bad debts of more than 1 percent of the total accounts receivable balance. Because Duckett reported to Kaul that most of the accounts receivable were certain to be paid, they were entered onto the books at face value. One account receivable in the face amount of $392,372.25 issued to ENM, a company with an imperfect credit record with UFE, was entered on the books at $250,000 and ultimately written down to $122,798.32 when the purchase price was allocated among the purchased assets. Other accounts receivable in the aggregate amount of $28,347 were deemed uncollectible and not entered on the books.

Among the assets received from Kroy, petitioner acquired raw material, work in progress, and finished inventory valued at $3,270,181, $1,979,176, and $1,890,693, respectively. Finished inventory in the amount of $1,529,573 was subject to preexisting customer orders, leaving inventory in the amount of $361,120 without pending orders. Having made an election to use LIFO inventory method in its first tax return, petitioner computed the value of inventory using the dollar-value, link-chain method, and placing all of its raw materials, work in progress, and finished inventory in a single business unit pool.

By a statutory notice of deficiency dated June 27, 1986, respondent determined that in acquiring the UFE division from Kroy, petitioner acquired intangible going-concern value in the amount of $1,477,000 and improperly treated the finished inventory (but not the raw materials or the work in progress) as a single business unit for purposes of LIFO pooling. By amended answer, respondent asserted that petitioner improperly treated the accounts receivable obtained from Kroy as a cash equivalent.

OPINION

*LIFO Inventory Accounting*

The first issue we must decide is whether, pursuant to section 472,[1] petitioner properly included the finished inventory that Kroy manufactured prior to acquisition in the LIFO inventory pool created for finished inventory that petitioner manufactured. Respondent argues that petitioner must create a separate LIFO pool for the acquired inventory because the sale of such inventory makes petitioner a wholesaler.

The LIFO inventory method allows the taxpayer to "treat those goods remaining on hand at the close of the taxable year as being (1) those included in the opening inventory of the taxable year, in the order of acquisition and to the extent thereof, and (2) those acquired during the taxable year." Sec. 1.472-1(a), Income Tax Regs. A taxpayer who has chosen to measure inventory using the dollar-value

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue.

method must group inventory items according to "natural business units." Sec. 1.472-8(b)(1), Income Tax Regs. A natural business unit includes "all items entering into the entire inventory investment for a natural business unit of a business enterprise." Sec. 1.472-8(b)(1), Income Tax Regs. Although the constitution of a natural business unit is a question of fact and circumstance, where "a manufacturer or processor is also engaged in the wholesaling or retailing of goods purchased from others, the wholesaling or retailing operations with respect to such purchased goods shall not be considered a part of any manufacturing or processing unit." Sec. 1.472-8(b)(2)(i), Income Tax Regs.

Respondent contends that petitioner is a wholesaler or retailer with respect to the finished inventory purchased from Kroy, and, therefore, that the finished inventory purchased from Kroy was improperly included in the same natural business unit pool as the raw materials, work in progress, and finished inventory manufactured subsequent to the purchase. Respondent does not challenge petitioner's inclusion of raw materials and work in progress acquired from Kroy in this pool. Respondent agrees that if petitioner had manufactured the finished inventory, it would have been properly includable in the pool. Relying on the regulations, respondent contends that their plain meaning indicates that petitioner was a wholesaler or a retailer with respect to the purchased finished inventory.

Petitioner argues that in purchasing raw materials, work in progress, and finished inventory, it merely stepped into Kroy's shoes and continued Kroy's business activity. Petitioner notes that it is only engaged in one business, the manufacture and sale of thermoplastic tools and parts, and all items of inventory should be included in a single natural business unit to properly reflect income. Petitioner contends that the isolated purchase of finished inventory from Kroy, occurring as a part of the purchase of all the business assets, should not be sufficient to transform petitioner into a wholesaler or retailer.

Respondent initially argued that petitioner's election to use the LIFO method of accounting was a change in accounting methods and that, therefore, petitioner must show the respondent's disallowance was arbitrary. Peti-

tioner, however, did not even have an accounting method prior to making the election and cannot be said to have changed methods. Respondent abandoned this argument after his opening brief, and we will not consider it further. Petitioner bears the burden of proof by a preponderance of the evidence. *Welch v. Helvering,* 290 U.S. 111, 115 (1933).

Petitioner's expert witness, Frank J. Kalis, Jr., (Kalis) a Certified Public Accountant and a partner in the accounting firm of Peat, Marwick, Mitchell & Co., reviewed petitioner's LIFO accounting methods. Kalis determined that they comported with generally accepted accounting principles (GAAP). While an accounting method may conform with GAAP, it does not necessarily follow that the method must clearly reflect income for purposes of the Federal income tax. *Thor Power Tool Co. v. Commissioner,* 64 T.C. 154, 166 (1975), affd. 563 F.2d 861 (7th Cir. 1977), affd. 439 U.S. 522 (1979).

Respondent argues that this case is controlled by our recent decision in *Amity Leather Products Co. v. Commissioner,* 82 T.C. 726 (1984). In *Amity Leather,* the taxpayer manufactured leather goods in the United States, and owned a subsidiary corporation that manufactured identical leather goods in Puerto Rico. The taxpayer regularly purchased finished goods from the Puerto Rican subsidiary. After packaging the Puerto Rican goods for domestic sale, the taxpayer sold them, grouping its inventory from all sources in a single LIFO pool. We held that the purchase of Puerto Rican goods made the taxpayer a wholesaler with respect to those goods, and we required the taxpayer to account for them in a separate inventory pool. We interpreted the language of the regulations to require separate pooling where the manufacturer of goods is "also engaged in the wholesaling of identical goods." 82 T.C. at 736.

*Amity Leather* presented very different facts from those in this case. The taxpayer in *Amity Leather* had established a course of business of buying finished inventory from the Puerto Rican subsidiary for resale, and could be said to be "engaged in the wholesaling of goods." In this case, however, petitioner made a single purchase of finished inventory as part of the larger purchase of all the assets of the business that had manufactured that inventory. We believe the regulations require a separate inventory pool for

a separate business unit. The issue is, therefore, whether petitioner's purchase of finished inventory for sale to customers is a separate "natural business unit" from petitioner's manufacturing operations. The standard appropriate to this inquiry, and the one that we applied in *Amity Leather,* is whether petitioner is engaged in a separate trade or business. If a taxpayer conducts an activity with continuity and regularity for profit, that activity is characterized as a trade or business. *Commissioner v. Groetzinger,* 480 U.S. 23 (1987). We cannot consider petitioner's single purchase to be a continuous and regular course of conduct and, therefore, we conclude that petitioner was not in the wholesaling or retailing business within the meaning of section 1.472-8(b), Income Tax Regs.

Respondent next argues that the overall purpose of the LIFO regulations is best furthered by his interpretation. Noting that the LIFO method is designed to diminish the effect of inflation on inventory accounting, respondent argues that goods purchased pursuant to the sale of business assets are artificially discounted and thus fail to reflect normal market fluctuations. It is evident that petitioner enjoyed a bargain in the overall purchase price, and a part of that bargain should be allocated to the finished inventory. Nevertheless, petitioner continued Kroy's thermoplastics business without interrupting operations, stepping smoothly into the shoes of its predecessor. The acquisition of the finished inventory, which was an integral part of the ongoing operations of the acquired business, was essential to that continuity. The finished inventory was, in the language of the regulations, part of "the entire productive activity of the enterprise * * * including (to the extent engaged in by the enterprise) the obtaining of materials, the processing of materials and the selling of manufactured or processed goods." Sec. 1.472-8(b)(2), Income Tax Regs. It would, in our view, distort income to remove the small amount of finished inventory from the business' ongoing flow of inventory accounting. We conclude that petitioner properly included the finished inventory in a single pool. This accounting treatment serves the overriding purpose of the LIFO regulations which is to match current costs against current income.

*Going-Concern Value*

We must next decide whether petitioner acquired going-concern value from Kroy in its purchase of the business. Petitioner bears the burden of proof by a preponderance of the evidence. *Welch v. Helvering, supra;* Rule 142(a), Tax Court Rules of Practice and Procedure. Going-concern value is an intangible, nonamortizable capital asset that is often considered to be part of goodwill. Goodwill has been defined as the "expectancy of *both* continuous excess earning capacity and also of competitive advantage or continued patronage." *Wilmot Fleming Engineering Co. v. Commissioner,* 65 T.C. 847, 861 (1976). (Emphasis added.) On the other hand, going-concern value has also been described as related less to the business reputation and the strength of customer loyalty, than to the operating relationship of assets and personnel inherent in an ongoing business. Going-concern value has been defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." *VGS Corp. v. Commissioner,* 68 T.C. 563, 591 (1977); *Conestoga Transportation Co. v. Commissioner,* 17 T.C. 506, 514 (1951). Going-concern value is manifested in the business' ability to resume business activity without interruption and to continue generating sales after an acquisition. *Computing & Software Inc. v. Commissioner,* 64 T.C. 223, 235 (1975). While courts have blurred these distinctions between goodwill and going-concern value, they are different conceptually. See *United States v. Cornish,* 348 F.2d 175, 184 (9th Cir. 1965); *Computing & Software Inc. v. Commissioner, supra* at 234-235; *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 685 (5th Cir. 1971).

After separate negotiations with Kroy for the name of the business, petitioner reserved $50,000 of the purchase price as the basis of purchased goodwill but made no provision for going-concern value. The purchase price paid for Kroy's thermoplastics business was considerably less than the sum of the individual fair market values of the purchased assets. Petitioner allocated the purchase price among the assets first to cash and cash equivalents, and then according to relative fair market values, including goodwill, pursuant to section 1.167(a)-5, Income Tax Regs. Respondent contends

that when petitioner purchased an ongoing business it also purchased going-concern value and, therefore, the purchase price must be reallocated among the assets to include allocation to a going-concern value.

Although the computation of going-concern value is subject to widely varying versions, our recent decision in *Concord Control, Inc. v. Commissioner*, 78 T.C. 742 (1982), on remand from 615 F.2d 1153 (6th Cir. 1980), affg. and remanding a Memorandum Opinion of this Court, describes succinctly but comprehensively the three most prevalent and useful methods: (1) The bargain method, (2) the residual method, and (3) the capitalization method.

The bargain method allows us to recognize the parties' arm's-length bargain as the appropriate measure of intangible value. *212 Corp. v. Commissioner*, 70 T.C. 788, 800 (1978). To use the bargain method, however, the parties must have specifically bargained for the various items of intangible value from adverse tax positions in arm's-length negotiations. 78 T.C. at 745.[2] If, as in this case, the parties have not bargained a transfer price for going-concern value, the bargain method is unavailable.

The second and most well-known method of computing going-concern value is the residual method.[3] Also frequently employed in computing the value of goodwill, the residual method subtracts the value of cash, cash equivalents and tangible assets from the purchase price, and the remainder constitutes aggregate intangible value. See *R.M. Smith, Inc. v. Commissioner*, 69 T.C. 317, 320-323 (1977), affd. 591 F.2d 248 (3d Cir. 1979), cert. denied 444 U.S. 828 (1979); *Jack Daniels Distillery v. United States*, 180 Ct. Cl. 308, 379 F.2d 569 (1967). The residual method can only be used where the value of the tangible assets acquired and value of the business as a whole are ascertainable with reasonable certainty. *Northern Natural Gas Co. v. United States*, 470

---

[2]See also *Black Industries, Inc. v. Commissioner*, T.C. Memo. 1979-61 (the bargain of the parties was not accepted because although the parties' general interests were adverse, their tax interests were not. The seller would not have recognized recapture income from the sale of depreciable assets and had no reason to oppose the allocation of bargained value away from intangible assets).

[3]The residual method was identified as the proper method to use when allocating basis among assets by sec. 1.338(b)-2T, Temp. Income Tax Regs., 51 Fed. Reg. 10624 (Mar. 28, 1986), effective for transactions occurring after May 6, 1986. Furthermore, sec. 1060 of the Internal Revenue Code of 1986 requires the use of the residual method for most asset acquisitions occurring after May 6, 1986.

F.2d 1107, 1110 (8th Cir. 1973), cert. denied 412 U.S. 939 (1973); *Solitron Devices, Inc. v. Commissioner*, 80 T.C. 1, 21-22 (1983), affd. without opinion 744 F.2d 95 (11th Cir. 1984).

Respondent's primary contention is that the purchase price of $14,708,068 was not the fair market value of the business at the time of the sale. We have held that if the purchase price does not reflect the fair market value of the business, the residual method should not be used. *Banc One Corp. v. Commissioner*, 84 T.C. 476, 502-503 (1985), affd. in an unpublished opinion 815 F.2d 75 (6th Cir. 1987). Ordinarily, however, a purchase price derived from arm's-length negotiations reflects fair market value. *Florida Publishing Co. v. Commissioner*, 64 T.C. 269, 279-280 (1975), affd. without opinion 552 F.2d 367 (5th Cir. 1977). If the purchase price is less than the value of the assets, the purchase price may not reflect fair market value, and evidence on that issue should be considered. *R.M. Smith, Inc. v. Commissioner*, 591 F.2d 248, 252-253 (3d Cir. 1979), affg. 69 T.C. 317 (1977), cert. denied 444 U.S. 828 (1979).

Respondent challenges the integrity of the purchase price on two grounds: (1) The purchasers were shareholders, and (2) liquidation of the UFE division to maximize the value of its assets was not explored or even seriously considered. Respondent's arguments have superficial appeal but run counter to the evidence presented at trial.

The record amply demonstrates that the purchase price paid for UFE division was fair even though it was less than the aggregate value of UFE's assets. Two lower tentative offers had been received from outside parties before Kaul, Johnson, and Heath made their offer. By the time their offer was made, there was tension within the board of directors, particularly between Gustafson and the ultimate buyers, and collusion was unlikely. Gustafson was very eager to sell UFE division and imbued the board of directors with his sense of urgency. The board of directors never investigated the liquidation value because they wanted to avoid the trouble of selling individual assets. Some members also believed it was in the best interest of Kroy not to "break up" the UFE division and thereby avoid layoffs. The evidence suggests that the board was aware of its fiduciary

duties to Kroy shareholders and exercised care in execution of those duties. The Kroy shareholders voted to approve the sale after the board received a fairness opinion by a respected investment banking firm that showed that the book value of UFE division's assets was close to the purchase price. Furthermore, the record indicates that the slump in the automotive industry on which UFE division's business depended and the capital intensive nature of the thermoplastics industry contributed to the low value of the business.

Respondent argues that because the sum of the value of the assets was $25 million, the business must have been worth at least $25 million as an ongoing entity. There is a significant difference between liquidation value, which is respondent's theory of value, and the ongoing value of the business. Because liquidation was not an alternative, liquidation value is not the appropriate test. There was no hidden value in the business that the parties to the sale conspired to obscure. To the contrary, the record supports the conclusion that the purchase price was the fair, arm's-length bargain of opposing parties with antagonistic interests. Because the purchase price petitioner paid for UFE division accurately and fairly reflected the value of the business, the residual method, the preferred method of valuation for intangibles, is appropriate. We conclude that, under the residual method, petitioner acquired no going-concern value.

The third method of valuing intangible value is the capitalization method described in *Concord Control v. Commissioner, supra.* Also labeled the "excess earnings" method, the capitalization method compares the earning potential of the tangible assets to that of an industry average. To the extent that the purchased assets generate greater earnings than the industry average, the difference is considered going-concern value. Using a report prepared by the accounting firm of Peat, Marwick, Mitchell & Co., which mirrors the figures found in Kroy's financial statement of March 31, 1979, we conclude that the capitalization method yields the same result as the residual method. In using the approach as set forth in *Concord Control v. Commissioner,*

*supra* at 746-750 and the figures of the accountants' report yields the following:

#1 Average UFE annual earnings ............... $1,309,760
#2 Fair market value of UFE assets ............ 13,031,697
#3 Industry average annual earnings
     computed at 12.9 percent ................ 1,681,089
#4 UFE average earnings less
     industry average earnings ................ (371,329)

The capitalization method as developed in *Concord Control,* shows that a purchaser of the UFE division would have expected to enjoy annual earnings less than those of the industry average. Under any of the three methods for determining going-concern value, petitioner did not purchase any.

Respondent's expert witness, John P. Huffman (Huffman), calculated going-concern value using a "costs-avoided" method, which respondent described as a variant of the capitalization method. Huffman's approach bears little resemblance to any capitalization method found elsewhere. Huffman's analysis began with the assumption that anyone buying an ongoing business must pay for being spared the time and expense of having to start the business himself and that, therefore, a going-concern value formula should result in what start-up costs were avoided. This is a novel theory, and one which confuses costs and value. Huffman's theory assumes that costs translate dollar for dollar into value, an assumption that we cannot accept. A buyer may well decide that he can make an economically sound offer to purchase because start-up costs are avoided, but it does not follow that he is paying for those costs in the purchase price. Moreover, Huffman's analysis suffers from more than a theoretical flaw. Huffman based his computations on completely unsupported assumptions and conjectures. Huffman decided that it would take 12 to 18 months to bring a thermoplastics business from start-up to production, and a total of 3½ years before the sales staff was prepared to function at peak level. Huffman next computed hypothetical operating earnings and net earnings. He calculated the net cost involved in starting a mythical thermoplastics business, which would acquire the assets and staff of petitioner, to be $3.076 million, assuming interest at

a rate of 13.5 percent per year and certain income levels. Huffman then discounted the start-up costs by 20 percent producing a value of $2.266 million. Huffman reduced this figure by 35 percent because the industry was experiencing a slump, producing total going-concern value of $1,477,000. Huffman's figures and his assumptions are pure conjecture. While he talked to "a number of people in the thermoplastics industry," these conversations were never related in sufficient detail to permit the Court an opportunity to evaluate Huffman's analysis. In short, Huffman's approach was an exercise in fantasy. We cannot accept Huffman's report as meaningful, and we give it no weight.

Respondent maintained vigorously at trial and on brief that every operating business must have going-concern value, even where the tangible assets are worth more than the business as a whole. Going-concern value, however, implies that assets produce more value working together than from being used separately in different business activities. Where, as here, the overall industry is weak and the assets are more valuable separately than together, the purchaser of the business receives an operation without ongoing-concern value. Both the residual method and the capitalization method bear out this observation.

*Accounts Receivable*

The third and final issue we must decide is the proper allocation of the purchase price to the accounts receivable transferred from Kroy to petitioner. Petitioner allocated a portion of the purchase price to the accounts receivable at face value, except for accounts that were uncollectible, to which no allocation was made, and except for the ENM note. This resulted in an aggregate basis of $4,651,783, which the parties have equated with fair market value.

Section 1012 provides that the basis of property is generally its cost. See also sec. 1.1012-1, Income Tax Regs. If a taxpayer purchases assets for a lump sum, the purchase price must be allocated among the assets proportionately to their relative fair market values. *C.D. Johnson Lumber Corp. v. Commissioner,* 12 T.C. 348, 363 (1949). Cash or cash equivalent items are excepted from this general rule of allocation and are accorded basis at face

value. *Victor Meat Co. v. Commissioner,* 52 T.C. 929, 931 (1969). Nothing inherent in the nature of accounts receivable makes them ineligible for treatment as cash equivalents, if the particular accounts satisfy the requirements of cash equivalency. *F. & D. Rentals, Inc. v. Commissioner,* 44 T.C. 335 (1965), affd. 365 F.2d 34 (7th Cir. 1966), cert. denied 385 U.S. 1004 (1967).

Respondent, by amended answer, argues that for accounts receivable to be cash equivalents, their collection must be guaranteed. He urges that the accounts acquired by petitioner were not secured, and therefore, that the accounts receivable should fall under the general allocation rule. Respondent bears the burden of proof by a preponderance of the evidence on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioner's position is that because the accounts receivable were from well-established businesses with long-standing and superlative credit histories, the accounts receivable should be considered cash equivalent. The ENM note, however, was less collectible and was discounted to $250,000 from the face amount of $392,372. Petitioner did not treat the ENM note as a cash equivalent. Almost all of the other purchased accounts receivable were, in fact, collected within 60 days. Furthermore, petitioner argues that by retaining the tools, without which the parts could not be made, it held a security interest which guaranteed payment. Similarly, petitioner points out that it was able to obtain outside financing to purchase UFE division based, in part, on the expectation that the accounts receivable would provide a reliable and immediate source of funds.

Cash equivalent items have been likened to "money in the bank." *F. & D. Rentals, Inc. v. Commissioner, supra* at 347. The question of cash equivalency requires an inquiry into fact and circumstance. *Whitlow v. Commissioner,* 82 F.2d 569 (8th Cir. 1936). Although the actual subsequent payment history of the debt is a factor, it is not dispositive. *Victor Meat Co. v. Commissioner, supra* at 932. If the accounts receivable are guaranteed or if all conditions precedent to payment have been satisfied, a note evidencing a debt may be considered cash equivalent. *Watson v. Commissioner,* 69 T.C. 544 (1978), affd. 613 F.2d 594 (5th

Cir. 1980); *Bixby v. Commissioner,* 58 T.C. 757, 785 (1972). Where payment is not guaranteed, we have held that cash equivalence is defined as being "in the nature of money" without restrictions or conditions upon payment. *R.M. Smith v. Commissioner,* 69 T.C. 317, 329 (1977), affd. 591 F.2d 248 (3d Cir. 1979), cert. denied 444 U.S. 828 (1979).

Respondent, however, places undue reliance on the absence of guarantees supporting the accounts receivable in this case. He argues for a legal test, viz, if accounts receivable are guaranteed then they should be treated as cash equivalents and if they are not, then they cannot be so treated. Respondent's analysis is contrary to the longstanding legal test, viz, whether the facts and circumstances show that the accounts receivable are the equivalent of cash. *Whitlow v. Commissioner, supra.* Respondent introduced no evidence that the accounts receivable would be sold at less than their face amount on the open market. Indeed, the parties have stipulated that face amount equals fair market value, and we will accept this stipulation as fact. Ordinarily, the price at which the accounts receivable will trade on the open market, or the fair market value, is the cash value. Having a definite cash value equal to face makes an account receivable "convertible into cash as a matter of certainty * * * (without) restrictions or conditions." *R.M. Smith Co. v. Commissioner, supra* at 329. Moreover, except for the ENM note (and a de minimis amount not recorded), the accounts receivable that petitioner acquired were from debtors whose creditworthiness was unimpeachable. Under these facts, except for the ENM note, the accounts receivable were equivalent to cash. Because the parties apparently agree that the accounts receivable have a present fair market value equal to the face value as allocated by petitioner after reviewing each account, we conclude that, except for the ENM note which had to be discounted, petitioner is correct in allocating basis to the accounts receivable in the amount of $4,651,783. The ENM note was not the equivalent of cash, and petitioner treated it as being subject to the general rule of allocation.

In summary, we conclude that petitioner was entitled to pool finished inventory acquired from Kroy in a single LIFO inventory pool and that petitioner did not receive any

going-concern value concomitant with the purchase of Kroy's assets. Furthermore, we conclude that respondent has failed to show that, except for the ENM note, the accounts receivable, in the amount of face value as determined by petitioner, are not equivalent to cash. In light of the foregoing,

*Decision will be entered for the petitioner.*