112 T.C. No. 7


UNITED STATES TAX COURT


MOUNTAIN STATE FORD TRUCK SALES, INC., E. P. O'MEARA, TAX MATTERS
PERSON, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16350-95.                      Filed March 2, 1999.


        Company M (M), a heavy truck dealer, purchased
heavy truck parts and accessories (parts) from the
manufacturers of those parts and sold them to its
customers.  M, which is required to use inventories
pursuant to sec. 471, I.R.C., made elections under sec.
472, I.R.C., effective as of the close of its taxable
year 1980, to apply the last-in, first-out (LIFO)
method of inventory accounting (LIFO method) with
respect to its parts inventory, to use the dollar-value
LIFO method, to calculate the price index for its parts
pool pursuant to the link-chain method, and to use the
"most recent purchases method" in computing the "total
current-year cost of items making up" its parts pool.
In determining that current-year cost as a first step
in valuing its parts inventory under the dollar-value
LIFO method, M used the respective manufacturers'
prices that were in effect as of the date of its physi-
cal inventory (replacement cost) for the inventoried
parts that it had purchased.

        Respondent determined that M's method of using
replacement cost in valuing its parts inventory under

the LIFO method does not clearly reflect income because it is contrary to the requirements of sec. 472, I.R.C., and the regulations thereunder and that M's ordinary income for the year at issue should be adjusted to include the amount of the so-called LIFO reserve that M had computed during the period 1980 through the year at issue.

Held:  Respondent did not abuse respondent's discretion in determining that M's method of using replacement cost in valuing its parts inventory under the LIFO method does not clearly reflect income.

Held, further:  Respondent did not place M on an impermissible method of inventory accounting when respondent adjusted M's ordinary income for the year at issue to include the amount of the so-called LIFO reserve that M had computed during the period 1980 through the year at issue, and consequently respondent did not abuse respondent's discretion in making that adjustment.

Leslie J. Schneider, Patrick J. Smith, and William F. Garrow, for petitioner.

Michael J. Cooper, for respondent.

CHIECHI, Judge:  Respondent determined S corporation adjustments for 1991 to the ordinary income of Mountain State Ford Truck Sales, Inc. (Mountain State Ford), in the amount of $504,013.

The issues remaining for decision are:

(1) Did respondent abuse respondent's discretion in determining that Mountain State Ford's method of using replacement cost in valuing its parts inventory under the LIFO method does not clearly reflect income?  We hold that respondent did not.

(2) Even though we have held that respondent did not abuse respondent's discretion in making the determination described above, did respondent abuse respondent's discretion by placing Mountain State Ford on an impermissible method of inventory accounting when respondent adjusted Mountain State Ford's ordinary income for 1991 to include the amount of the so-called LIFO reserve that it had calculated during the period 1980 through 1991? We hold that respondent did not.

## FINDINGS OF FACT[1]

Some of the facts have been stipulated and are so found.

Mountain State Ford, which was incorporated in Delaware in 1968 and has been an S corporation since its taxable year 1987, had its principal place of business in Denver, Colorado, at the time the petition was filed. E. P. O'Meara (Mr. O'Meara), who worked in the automobile and truck dealer industry on a part-time basis since late 1939 and on a full-time basis since January 1947, is Mountain State Ford's tax matters person.

In January 1968, Mr. O'Meara started operating Mountain State Ford as a heavy truck dealer under a management agreement with Ford Motor Company (Ford), which owned all of its stock. As a heavy truck dealer for Ford, Mountain State Ford carried, and maintained an inventory of, different types of heavy truck parts

---

[1] Unless otherwise indicated, our Findings of Fact and Opinion pertain to all periods since the incorporation of Mountain State Ford to the trial in this case; all section references are to the Internal Revenue Code (Code) in effect for the year at issue; and all Rule references are to the Tax Court Rules of Practice and Procedure.

and accessories manufactured by Ford. It also carried different types of parts of other manufacturers, some of which were present in 1968 and others of which were added later.

Mr. O'Meara continued operating Mountain State Ford under the management agreement with Ford until around 1978. At that time, Mr. O'Meara, his son Eugene Peter O'Meara, Jr., and other family members completed their purchase from Ford, pursuant to the terms of that management agreement, of all of the stock of Mountain State Ford, which they began acquiring during 1975. After having purchased all of the stock of Mountain State Ford, Mr. O'Meara and Eugene Peter O'Meara, Jr., continued to operate Mountain State Ford as a heavy truck dealer for Ford. On July 31, 1985, Mountain State Ford became a heavy truck dealer for American Isuzu Motors Inc. and began carrying its parts.

Eugene Peter O'Meara, Jr., has been employed by Mountain State Ford since 1974 and has served as its president since 1990. As its president, Eugene Peter O'Meara, Jr., oversaw all of the operations of Mountain State Ford, including its new and used heavy truck sales departments, parts department, service department, and lease and rental operations.

From its incorporation until the date in 1978 on which Ford no longer owned any stock of Mountain State Ford, only Ford employees served as members of the board of directors of Mountain State Ford. Nonetheless, Mr. O'Meara was involved in all aspects of Mountain State Ford's business since it was formed in 1968 and

served at various times as Mountain State Ford's general manager, president, and chairman of its board of directors.

When Mountain State Ford commenced business in 1968, the accounting methods that it adopted and the books and records that it maintained were in accordance with the Ford standard system for Ford truck dealers. That system included the way in which the parts inventory was to be maintained. Throughout the period from its incorporation until 1978 when Ford no longer owned any stock of Mountain State Ford, Ford required that Mountain State Ford retain an independent certified public accountant (C.P.A.) to conduct an annual audit, prepare its financial statements, provide an unqualified opinion for those statements, prepare its tax returns, and observe the taking of its physical inventory. During that same period, Ford required that Mountain State Ford's independent C.P.A. value Mountain State Ford's parts inventory (1) for Ford parts on the basis of "the dealer net prices as incorporated in the latest dealer price lists published by Ford" and (2) for other manufacturers' parts on the basis of "the dealer net prices as incorporated in the latest dealer price lists published by the applicable manufacturer".

On a daily basis, Mountain State Ford ordered and received parts from manufacturers that ranged in number from one to hundreds, sold parts to customers, and, for reasons not disclosed by the record, received parts that were returned by certain of its customers. The price that each manufacturer charged Mountain State Ford for each of the parts that it ordered was published in

a price list or price catalog (price catalog) that each such manufacturer distributed to heavy truck dealers, including Mountain State Ford. On a periodic basis, each manufacturer updated its price catalog to reflect any changes in the prices of such manufacturer's parts and distributed such updated price catalogs to Mountain State Ford and other heavy truck dealers. During the period 1980 through 1991, Ford distributed approximately four to six updated price catalogs each year.

The different types of parts that Mountain State Ford carried fluctuated in quantity, but usually totaled about 12,000 out of approximately 17,000 potential different types of parts. For each such type of part, Mountain State Ford could have carried as few as one unit or as many as several dozen units, each or several of which it acquired at different times and different prices and from different manufacturers. The units of different types of parts in Mountain State Ford's parts inventory turned over at different rates. While Mountain State Ford's parts inventory generally turned over every 3 or 4 months, some units of different types of parts were in its parts inventory for more than 12 months.

The respective manufacturers of the different types of parts carried by Mountain State Ford assigned parts numbers (parts numbers) to those types of parts. During any year, a manufacturer could have (1) changed a part number for a type of part without altering that type of part and/or (2) added a new part number because it altered an existing type of part and/or occa-

sionally developed a new type of part. However, from year to year, only 10 percent to 15 percent of the parts numbers for parts carried by Mountain State Ford changed. For the parts numbers that did change, Mountain State Ford could have determined the corresponding parts numbers for the year prior to the change, but did not do so.

While each different type of part that Mountain State Ford carried in its parts inventory was assigned a part number, in most instances each unit of a particular type of part was not identified separately from every other unit of that same type of part. However, in some instances each unit of the same type of certain large parts, such as engines, transmissions, and rear axles, was identified not only by a part number, but also by a serial number.

Consistent with standard industry practice for heavy truck dealers, Mountain State Ford maintained an inventory of parts by using a computerized recordkeeping system which listed, inter alia, the quantity of units on hand of each of the different types of parts that it carried. Mountain State Ford maintained that system, which it referred to as its perpetual recordkeeping system (perpetual inventory recordkeeping system), with the assistance of a company that provided computer services (computer vendor) to businesses in the heavy truck dealer industry. The manufacturers authorized several computer vendors to assist heavy truck dealers in the valuation of those dealers' parts inventories. Prior to 1994 Mountain State Ford utilized Ford's Dealer

Computer Services Division, and since 1994 it has utilized ADP, Inc., as its computer vendor. In addition to advising Mountain State Ford and other heavy truck dealers of changes in the prices of its parts through the periodic distribution of updated price catalogs, each manufacturer provided to the computer vendors, at about the same times it distributed such catalogs, computer-ready mediums, such as magnetic tapes (computerized price update tapes), which reflected such price changes.

Under its perpetual inventory recordkeeping system, Mountain State Ford (1) added to its parts inventory the number of units of each type of part that were delivered and returned to it and (2) removed from its parts inventory the number of units of each type of part that it sold. When Mountain State Ford received the parts that it had ordered from a manufacturer, it also received a computer-ready medium, such as a magnetic tape (shipping tape), and packing sheets (packing sheets) that included a packing slip. The shipping tape reflected the part number of each type of part and the number of units of each such type that the manufacturer had shipped, or had intended to ship, to Mountain State Ford, but did not contain any information showing the prices that the manufacturer charged Mountain State Ford for those parts. Mountain State Ford used the shipping tape to enter into its perpetual inventory recordkeeping system the part number and the number of units of each type of part that the manufacturer shipped, or intended to ship, to it.

The packing sheets that accompanied each shipment of parts to Mountain State Ford reflected the same information which appeared on the shipping tape and which Mountain State Ford entered into its perpetual inventory recordkeeping system. Mountain State Ford used the packing sheets to verify that it received the quantity of units of each type of part that was shown as shipped on such sheets and on the shipping tape. Upon delivery at Mountain State Ford's place of business of parts shipped to it, an employee in its parts department compared the packing sheets with the quantity of units of each type of part that had been delivered. If after making that comparison the employee determined that the packing sheets were inaccurate, an employee adjusted Mountain State Ford's perpetual inventory recordkeeping system to reflect the quantity of units of each type of part that had in fact been delivered to it.

At the end of each business day, Mountain State Ford transmitted to its computer vendor a record of the transactions that were effected on that day. The computer vendor computed a value for the quantity of units of each type of part (1) delivered to, (2) returned to, and/or (3) sold by Mountain State Ford on each business day by using the price which the manufacturer of each such type was charging on that day and which was reflected on the computerized price update tape that each such manufacturer had provided to that vendor and in the updated price catalog that each such manufacturer had distributed to Mountain State Ford and other heavy truck dealers.

Mountain State Ford generally received invoices on a monthly basis from the manufacturers for the parts that those manufacturers had shipped, or had intended to ship, to it. With respect to those parts, each such invoice showed the part number of each type of part, the quantity of units of each such type, and the purchase price of each such unit. (We shall sometimes refer to the price of each unit of each type of part as shown on the invoice that the manufacturer sent to Mountain State Ford as the invoice price.)

Upon receipt of a manufacturer's invoice, an employee of Mountain State Ford entered the total of the invoice prices (aggregate invoice price) of all the parts, but not the invoice price of each unit of each type of part, into an account which Mountain State Ford maintained for the parts that it purchased (purchases account). Mountain State Ford did not utilize the purchases account in maintaining its inventory. Another employee of Mountain State Ford in charge of payables verified with the parts department that Mountain State Ford had received the number of units of each type of part that was listed on each invoice, and, if so, Mountain State Ford paid the aggregate invoice price. Once Mountain State Ford paid the aggregate invoice price, it filed the invoice by manufacturer and invoice date.

Where (1) there was a shortage in the quantity of units of one or more types of parts that the manufacturer intended to ship to Mountain State Ford, as shown on the shipping tape and the packing sheets, (2) the manufacturer mistakenly sent Mountain

State Ford an invoice which billed it for the units that it had not received, and (3) Mountain State Ford paid, for reasons not disclosed in the record, the incorrect aggregate invoice price, Mountain State Ford filed a shortage claim (shortage claim) with the manufacturer from whom it had ordered the parts. In those instances where Mountain State Ford filed a shortage claim, the manufacturer to whom such a claim was made issued a credit to Mountain State Ford in an amount calculated by reference to the manufacturer's price in effect around the time Mountain State Ford filed the shortage claim for each unit listed in that claim. The manufacturer issued a credit in that amount regardless whether it had originally charged, and sent Mountain State Ford an invoice showing, a different invoice price for each such unit.

Mountain State Ford took a physical inventory in late September or early October, and in a couple of instances in early November, of each year and adjusted the balance of the quantity of the units of each type of part reflected in its perpetual inventory recordkeeping system to reflect each such quantity physically on hand. After taking the physical inventory, Mountain State Ford notified the computer vendor of each such quantity physically on hand. Consistent with standard industry practice in the heavy truck dealer industry, the computer vendor determined the value of Mountain State Ford's parts inventory as of the date of the physical inventory by computing a value for the quantity of units of each type of part physically on hand by using the price which the manufacturer of each such type was

charging as of that date and which was reflected on the computerized price update tape that each such manufacturer had provided to that vendor. (We shall refer to the prices reflected on those tapes at which the different types of parts were valued as of the date of Mountain State Ford's physical inventory as replacement cost.)  The replacement cost on which Mountain State Ford valued the parts in its parts inventory as of the date of the physical inventory was not necessarily the same as the invoice prices thereof.  In order to determine the value of its parts inventory at the end of each year (ending parts inventory), Mountain State Ford adjusted, in a manner not disclosed by the record, its parts inventory valued at the time of its physical inventory for any deliveries and returns of parts to it and/or sales of parts by it between that time and the end of the year.  Prior to 1980, Mountain State Ford's ending parts inventory, determined as just described, was used as its ending parts inventory for both financial statement and Federal income tax (Federal tax) purposes.

Throughout the period from its incorporation until the date in 1978 on which Ford no longer owned any stock of Mountain State Ford, Mountain State Ford did not use the invoice prices or the purchases account in maintaining its inventory under its perpetual inventory recordkeeping system.  That was because, as discussed above, Ford required that Mountain State Ford's parts inventory be valued for Ford parts on the basis of "the dealer net prices as incorporated in the latest dealer price lists

published by Ford" and for other manufacturers' parts on the basis of "the dealer net prices as incorporated in the latest dealer price lists published by the applicable manufacturer". Nor did Mountain State Ford maintain inventory records which showed the invoice price that it paid for each unit of each type of part (1) delivered and/or returned to it and added to its parts inventory and/or (2) sold by it and removed from that inventory. However, Mountain State Ford did maintain other records, such as accounts payable records and invoices, which listed the invoice price paid by Mountain State Ford for each unit of each type of part delivered to it.

After 1978, when Ford no longer owned any stock of Mountain State Ford, Mountain State Ford was free to use an engagement letter in employing a C.P.A. to audit its financial statements and prepare its tax returns that was different from the letter that it had previously used when Ford owned stock of Mountain State Ford. Mountain State Ford also became free to adopt accounting methods and/or procedures that were different from those which it employed when it was owned by Ford, including its method of valuing its parts inventory on the basis of replacement cost, provided that it sought and received the consent of the Internal Revenue Service before it made a change, inter alia, in that method of valuing its parts inventory. After 1978, when Ford no longer owned any stock of Mountain State Ford, Mountain State Ford made no attempt to determine whether it could have modified its perpetual inventory recordkeeping system so that it

could have used invoice prices in valuing its parts inventory. Nor did it determine whether it could have created a new inventory recordkeeping system that could have used invoice prices in that inventory valuation process. Instead, Mountain State Ford continued to use replacement cost in valuing its parts inventory because it had used that method when Ford owned it and because that was the method used by the heavy truck dealer industry.

In 1978, respondent conducted an examination of Mountain State Ford's return for 1976, during which respondent requested documents with respect to Mountain State Ford's inventories for that year. As part of that examination, respondent did not propose any adjustments to Mountain State Ford's method of valuing its parts inventory.

From its incorporation in 1968 through 1979, Mountain State Ford accounted for its parts inventory on the basis of the lower of cost or market (LCM). Mountain State Ford submitted Form 970 (Form 970), Application to Use LIFO Inventory Method, with its 1980 return. In that form, Mountain State Ford adopted the LIFO method of valuing its parts inventory and its new heavy trucks inventory, effective as of the close of its taxable year ended December 31, 1980. It adopted the same method for both financial statement and Federal tax purposes. As pertinent here with respect to Mountain State Ford's parts inventory,[2] the Form 970

---

[2] Mountain State Ford's election of the LIFO method with respect to its new heavy trucks inventory is not at issue in this case.

stated that Mountain State Ford intended to (1) take inventory "at actual cost regardless of market value", (2) value its parts inventory on the dollar-value LIFO method, (3) use one pool (parts pool) for its parts inventory, (4) calculate the price index for its parts pool pursuant to the link-chain method, and (5) "determine the cost of * * * [parts] in the closing inventory in excess of those in the opening inventory" on the basis of "most recent purchases"; i.e., pursuant to the most recent purchases method under section 1.472-8(e)(2)(ii)(a), Income Tax Regs. (most recent purchases method).  Mountain State Ford attached a schedule to the Form 970 which stated in pertinent part:

> Cost System Used for Parts Inventory
>
> The taxpayer [Mountain State Ford] keeps detailed records of the cost of all parts in inventory.  The total actual cost of all parts inventory will be divided by the number of each type of part on hand at the end of the year.

In response to a request in the Form 970 to indicate the "Method used in computing LIFO value of dollar-value pools", Mountain State Ford attached a schedule which stated in pertinent part:

> Link-Chain Method for Parts Inventory
>
> The taxpayer [Mountain State Ford] receives weekly reports from Ford Motor Company which indicate the increase in prices for a major portion of the parts inventory which is supplied to the taxpayer from Ford Motor Company.  The taxpayer compares this list of prices with the actual cost of the same items in the parts inventory to develop a current year price index. * * * The index developed by this large sample is then applied to the total parts inventory.  Once a yearly index is developed it will be added to prior year indices to develop a cumulative index.

After having elected the LIFO method, Mountain State Ford continued to use replacement cost, determined in the same manner as it had calculated it prior to that election, in valuing its ending parts inventory for financial statement and Federal tax purposes. However, Mountain State Ford used replacement cost in that valuation process as the starting point in determining its ending parts inventory under the dollar-value LIFO method; i.e., it used replacement cost in the computation of the total current-year cost of items making up its parts pool under section 1.472-8(e)(2)(ii), Income Tax Regs. (current-year cost of its parts pool). After computing such current-year cost, Mountain State Ford computed an annual price index designed to measure the change in the cost of parts from one year to the next. That index was computed by reference to, inter alia, the respective manufacturers' prices each week for parts carried by Mountain State Ford in its parts inventory and the respective manufacturers' prices for such parts as of the end of the preceding week.

At the time Mountain State Ford adopted the LIFO method, it made no attempt to determine whether it could have modified its perpetual inventory recordkeeping system so that it could have used invoice prices in valuing its parts inventory. Nor did it determine whether it could have created a new inventory recordkeeping system that could have used invoice prices in that valuation process. Instead, Mountain State Ford continued to use replacement cost in valuing its parts inventory under the LIFO

method because it had used that method prior to adopting the LIFO method and because that was the method used by the heavy truck dealer industry. In using replacement cost in valuing its parts inventory under the LIFO method, Mountain State Ford was not attempting to, and did not, determine or approximate the invoice prices of the parts that it purchased.

On May 22, 1995, respondent issued a notice of final S corporation administrative adjustment (notice or FSAA) for 1991 to Mr. O'Meara, the tax matters person. In the notice, respondent did not terminate the elections that Mountain State Ford made in the Form 970 to value its parts inventory under the dollar-value, link-chain LIFO method and to use the most recent purchases method in determining the current-year cost of its parts pool. However, respondent determined in the notice that the cost of goods sold reported in Mountain State Ford's 1991 return should be reduced, and the ordinary income reported in that return should be increased, by $463,515.[3] The amount of that reduction and that increase was equal to the amount of the LIFO reserve that Mountain State Ford had calculated over the period 1980 through 1991 (LIFO reserve). The adjustment at issue in the notice thus was based on restoring to Mountain State Ford's income the amount of that LIFO reserve. In making that adjustment, respondent was unable to, and did not, recompute Mountain State Ford's non-LIFO inventory value under a method

---

[3] The parties settled the remaining adjustments in the notice.

using the invoice prices of parts inventoried or a cost other than replacement cost. That was because Mountain State Ford did not have, and did not provide to respondent, the records that were necessary in order to calculate for the period 1980 through 1991 (1) the LIFO value and the non-LIFO value of its parts inventory and (2) its LIFO reserve on the basis of invoice prices or a cost other than replacement cost. Thus, the non-LIFO value that was used to compute the amount of the adjustment at issue in the notice (i.e., the amount of the LIFO reserve that Mountain State Ford had calculated for the period 1980 through 1991) was based on replacement cost.

OPINION

The issues presented implicate not only section 472, entitled "Last-In, First-Out Inventories", but also section 446, entitled "General Rule for Methods of Accounting", and section 471, entitled "General Rule for Inventories". Sections 446 and 471 and the regulations thereunder are the provisions that vest the Commissioner of Internal Revenue (Commissioner) with wide discretion in determining whether a method of inventory accounting should be disallowed because it does not clearly reflect income. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979); Consolidated Manufacturing, Inc. v. Commissioner, 111 T.C. 1, 19 (1998). The Commissioner's interpretation of the clear-reflection standard under sections 446 and 471 may not be disturbed unless it is clearly unlawful or plainly arbitrary. Thor Power Tool Co. v. Commissioner, supra; Consolidated Manufac-

turing, Inc. v. Commissioner, supra.  The Commissioner's discretion under sections 446 and 471 is not unbridled, however.  Thor Power Tool Co. v. Commissioner, supra at 533; Consolidated Manufacturing, Inc. v. Commissioner, supra.  Even if a taxpayer's accounting method does not result in a clear reflection of income, the Commissioner may not change the taxpayer's accounting method to another method that also fails to reflect income clearly.  Harden v. Commissioner, 223 F.2d 418, 421 (10th Cir. 1955), revg. 21 T.C. 781 (1954) and affg. Harden v. Hinds, 48 AFTR 1268, 54-1 USTC par. 9348 (W.D. Okla. 1954); Rotolo v. Commissioner, 88 T.C. 1500, 1514 (1987).

As framed by petitioner, the question relating to the clear-reflection-of-income standard is whether respondent abused respondent's discretion in concluding that, in computing the LIFO value of its dollar-value parts pool under the link-chain method,[4] Mountain State Ford's use of replacement cost in

---

[4] The parties disputed at trial whether there are deficiencies in the manner in which Mountain State Ford computed the price indices under its link-chain method.  However, after trial the parties entered into a second supplemental stipulation regarding those price indices.  According to that stipulation, in the event that the Court were to sustain Mountain State Ford's method of using replacement cost in computing the LIFO value of its parts inventory, respondent's adjustment in the notice to Mountain State Ford's ordinary income for 1991 would be reduced from $463,515 to $53,870.  That reduction would be made in that event in order to reflect the parties' agreement in the second supplemental stipulation to correct certain of the alleged deficiencies that respondent had found in Mountain State Ford's computation of the price indices under its link-chain method. The parties further agreed in that stipulation that in the event that the Court were not to permit Mountain State Ford's method of using replacement cost in computing the LIFO value of its parts
(continued...)

determining the current-year cost of its parts pool pursuant to any other proper method under section 1.472-8(e)(2)(ii)(d), Income Tax Regs.[5] (any other proper method), which petitioner claims Mountain State Ford elected in the Form 970, does not clearly reflect income.  Respondent agrees with petitioner's framing of the issue relating to the clear-reflection-of-income standard except that respondent contends that Mountain State Ford

---

[4](...continued)
inventory, respondent's adjustment in the notice to Mountain State Ford's ordinary income for 1991 would be sustained.  Thus, no issue regarding the price indices calculated by Mountain State Ford under its link-chain method remains for our decision.

[5]  Sec. 1.472-8(e)(2), Income Tax Regs., which describes the double-extension method of computing the LIFO value of a dollar-value pool, provides in pertinent part:

> (ii) The total current-year cost of items making up a pool may be determined--
>
> > (a) By reference to the actual cost of the goods most recently purchased or produced;
> >
> > (b) By reference to the actual cost of the goods purchased or produced during the taxable year in the order of acquisition;
> >
> > (c) By application of an average unit cost equal to the aggregate cost of all of the goods purchased or produced throughout the taxable year divided by the total number of units so purchased or produced; or
> >
> > (d) Pursuant to any other proper method which, in the opinion of the Commissioner, clearly reflects income.

Although sec. 1.472-8, Income Tax Regs., relating to the dollar-value LIFO method does not discuss how the link-chain method that Mountain State Ford elected in the Form 970 is to be applied, the parties agree that sec. 1.472-8(e)(2)(ii), Income Tax Regs., applies to the link-chain method.

elected in the Form 970 to use the most recent purchases method, and not any other proper method, in determining the current-year cost of its parts pool.[6]

In inventorying goods with respect to which a taxpayer elected the LIFO method, the taxpayer is required to (1) treat those goods remaining on hand at the end of the taxable year as being (a) those included in the opening inventory of the taxable year, in the order of acquisition and to the extent thereof, and (b) those acquired during the taxable year, sec. 472(b)(1); sec. 1.472-1(a), Income Tax Regs.; and (2) inventory them at cost, sec. 472(b)(2); sec. 1.472-2(b), Income Tax Regs.

There are two basic LIFO computational systems. One is based on specific goods (specific-goods LIFO method). See sec. 1.472-2, Income Tax Regs. The other is based on the dollars invested in inventory and is known as the dollar-value LIFO method. See sec. 1.472-8, Income Tax Regs. Under the specific-goods LIFO method, quantitative changes in inventory during the year are measured in terms of an appropriate unit, such as pounds, pieces, or gallons. The dollar-value LIFO method deter-mines increases or deceases in inventory in terms of total

---

[6] The parties and their respective experts also disagree about whether Mountain State Ford's method of using replacement cost under the LIFO method complies with generally accepted accounting principles (GAAP) and conforms as nearly as may be to the best accounting practice in Mountain State Ford's trade or business, as required by sec. 471 and the regulations thereunder. However, our resolution of the disagreement between the parties about the clear-reflection-of-income standard makes it unnecessary for us to address the parties' and their respective experts' dispute over GAAP.

dollars, rather than in terms of physical units.  Amity Leather
Prods. Co. v. Commissioner, 82 T.C. 726, 732 (1984).  To deter-
mine under the dollar-value LIFO method whether there has been an
increase or a decrease in inventory during the year, the ending
inventory is valued in terms of total dollars that are equivalent
in value to the dollars used to value the beginning inventory.
Id.

Respondent argues that the term "cost" in section 472(b)(2)
and the regulation thereunder (viz., section 1.472-2(b), Income
Tax Regs.) means actual cost and that, as required by section
472(b)(2), section 1.472-8(e)(2)(ii), Income Tax Regs., pertain-
ing to the dollar-value LIFO method mandates that the determina-
tion of the current-year cost of items making up a pool be made
on the basis of, or by reference to, actual cost.  According to
respondent, Mountain State Ford's method of using replacement
cost, instead of actual cost, in determining the current-year
cost of its parts pool contravenes those requirements of the Code
and regulations, and consequently that method does not clearly
reflect income.

Petitioner concedes that if the Court were to find that
Mountain State Ford's method of using replacement cost were to
contravene the requirements of the provisions of the Code and the
regulations upon which respondent relies, that method would not
clearly reflect income.  However, petitioner argues that those
provisions do not require that Mountain State Ford determine the
current-year cost of its parts pool by using actual cost.

According to petitioner, respondent's interpretation of the term "cost" in section 472(b)(2) as meaning actual cost is wrong, and Mountain State Ford's method of using replacement cost qualifies as any other proper method under section 1.472-8(e)(2)(ii)(d), Income Tax Regs., which does not require the use of actual cost.

To support his argument that respondent's position about the meaning of the term "cost" in section 472(b)(2) and the regulation thereunder is wrong, petitioner asserts:

> With regard to the "cost" requirement in section 472(b)(2), the petitioner submits that an examination of the statute and regulations, as well as the historical development surrounding the LIFO method, makes clear that the cost requirement in section 472(b)(2) is simply the expression of the rule that the lower of cost or market method may not be used in conjunction with the LIFO method. Accordingly, the respondent is attempting to extend the cost requirement in section 472(b)(2) far beyond its intended scope.

> *    *    *    *    *    *    *

> * * * The use of replacement costs * * * under the dollar-value LIFO method does not in any way represent a use of lower of cost or market and, accordingly, does not violate the cost requirement of section 472.

Even assuming arguendo that petitioner were correct in his contention about the reason why Congress required that goods for which a taxpayer elected the LIFO method be inventoried at cost,[7] that contention does not address the meaning of the term "cost"

---

[7]  It is noteworthy that the replacement cost as of the date of Mountain State Ford's physical inventory, which it used in determining the LIFO value of its dollar-value parts pool, is analogous to "market" in inventory tax accounting. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 534 (1979); sec. 1.471-4(a)(1), Income Tax Regs.

in section 472(b)(2) and the regulation thereunder.  Section 472(b)(2) provides:

> (b) Method Applicable.--In inventorying goods specified in the application described in subsection (a), the taxpayer shall:
>
>        *       *       *       *       *       *       *
>
> (2) Inventory them at cost * * *

The regulation under section 472(b)(2), section 1.472-2(b), Income Tax Regs., provides:

> (b) The inventory shall be taken at cost regardless of market value.

Both parties rely in part on dictionary definitions of the word "cost" to support their divergent positions regarding the meaning of the term "cost" in section 472(b)(2) and the regulation thereunder.  According to respondent, the commonly understood and generally accepted meaning of the word "cost", as reflected in dictionary definitions, is actual cost.  According to petitioner, dictionary definitions of the word "cost" "clearly encompass replacement cost."   We agree with respondent.

Black's Law Dictionary 345 (6th ed. 1990) defines the word "cost" to mean:  "Expense; price.  The sum or equivalent expended, paid or charged for something.  See also Actual cost; Costs; Net cost; Rate."  Merriam-Webster's Collegiate Dictionary 262 (10th ed. 1996) defines the word "cost" to include:  "The amount or equivalent paid or charged for something:  price."  Webster's Third New International Dictionary 515 (1993 ed.) defines the word "cost" to include:  "the amount or equivalent

paid or given or charged or engaged to be paid or given for anything bought or taken in barter or for service rendered".  We conclude that the common and ordinary meaning of the word "cost" is actual cost or the price paid for something.[8]

We see no reason, however, to rely in this case on dictionary definitions of the word "cost" to determine the meaning of the term "cost" in section 472(b)(2) and section 1.472-2(b), Income Tax Regs.  That is because the term "cost" is defined in regulations under section 471, the "General Rule for Inventories".  Application of the definition of cost in those regulations (section 1.471-3, Income Tax Regs., entitled "Inventories at cost"), which is based on what we have concluded is the common and ordinary meaning of the word "cost", will result in a determination of the actual cost of merchandise or goods purchased or produced during the taxable year,[9] or in certain instances an approximation of such cost determined upon a reasonable basis (reasonable approximation).[10]

---

[8]  The accounting profession generally defines the word "cost" as used in inventory accounting "as the price paid or consideration given to acquire an asset".  Accounting Research Bulletin No. 43, "Restatement and Revision of Accounting Research Bulletins", ch. 4, statement 3 (June 1953).

[9]  As pertinent here, sec. 1.471-3(b), Income Tax Regs., defines the term "cost" in the case of merchandise purchased since the beginning of the taxable year as "the invoice price".

[10]  Sec. 1.471-3(d), Income Tax Regs., provides in pertinent part that in certain instances "costs may be approximated upon such basis as may be reasonable and in conformity with established trade practice in the particular industry."

The definition of the term "cost" in section 1.471-3, Income Tax Regs., is virtually the same as the definition of the term "cost" as it appeared in the regulations promulgated under section 203 of the Revenue Act of 1918 (1918 Act), ch. 18, 40 Stat. 1060, the original predecessor of section 471, which first required certain taxpayers to use the inventory accounting method.  See Regs. 45, art. 1583 (1918).  The definition of the term "cost" as it appeared in the regulations under the 1918 Act was repromulgated in virtually the same language in the regulations issued under all subsequent Federal tax provisions that continued to require certain taxpayers to use the inventory accounting method.  The term "cost" in inventory tax accounting had a settled meaning when Congress first permitted certain taxpayers to elect the LIFO method, Revenue Act of 1938, ch. 289, sec. 22(d), 52 Stat. 459,[11] and shortly thereafter when Congress

_____

[11]  The regulations in effect when Congress first allowed certain taxpayers to elect the LIFO method and required that the goods with respect to which that method was elected be inventoried at cost, Regs. 94, art. 22(c)-3 (1936), defined the term "cost" for inventory accounting purposes as follows:

Art. 22(c)-3.  Inventories at cost.--Cost means:

(1) In the case of merchandise on hand at the beginning of the taxable year, the inventory price of such goods.

(2) In the case of merchandise purchased since the beginning of the taxable year, the invoice price less trade or other discounts, except strictly cash discounts approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, provided a consistent course is followed.  To this net invoice price should be added transportation or other necessary

(continued...)

permitted all taxpayers to elect that method, Revenue Act of 1939, ch. 247, sec. 219, 53 Stat. 877.  In requiring that goods for which a taxpayer adopted the LIFO method be inventoried at cost, Congress presumptively was aware of the established regulatory definition of the term "cost" in inventory tax accounting. If Congress had intended for the term "cost" in LIFO inventory tax accounting to have a meaning different from that regulatory definition, it would have so stated.  It did not do so when it

---

[11](...continued)
charges incurred in acquiring possession of the goods.

(3) In the case of merchandise produced by the taxpayer since the beginning of the taxable year, (a) the cost of raw materials and supplies entering into or consumed in connection with the product, (b) expenditures for direct labor, (c) indirect expenses incident to and necessary for the production of the particular article, including in such indirect expenses a reasonable proportion of management expenses, but not including any cost of selling or return on capital, whether by way of interest or profit.

(4) In any industry in which the usual rules for computation of cost of production are inapplicable, costs may be approximated upon such basis as may be reasonable and in conformity with established trade practice in the particular industry.  Among such cases are (a) farmers and raisers of live stock (see article 22(c)-6), (b) miners and manufacturers who by a single process or uniform series of processes derive a product of two or more kinds, sizes, or grades, the unit cost of which is substantially alike (see article 22(c)-7), and (c) retail merchants who use what is known as the "retail method" in ascertaining approximate cost (see article 22(c)-8).

The definition of the term "cost" in Regs. 94, art. 22(c)-3 (1936), is virtually identical to the definition of that term in sec. 1.471-3, Income Tax Regs.

first enacted the LIFO provisions or at any other time thereafter.  We hold that the definition of the term "cost" in section 1.471-3, Income Tax Regs., which is intended to arrive at actual cost, applies to the term "cost" in section 472(b)(2) and the regulation thereunder.[12]  See Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152, 158-159 (1993).

_____

[12]  Our holding as to the meaning of the term "cost" in sec. 472(b)(2) and the regulation thereunder disposes of petitioner's contention that "respondent may not interpret the rules and regulations in a way that will impose unreasonable administrative burdens on taxpayers attempting to use the LIFO method or in a way that will diminish or eliminate the availability of the LIFO method to a significant group of taxpayers".  Respondent has no discretion to deviate from the requirements of the Code and the regulations even if such requirements were to impose administrative burdens on Mountain State Ford.  On the record before us, however, we find that petitioner has not established that respondent's position in the present case that the term "cost" in sec. 472(b)(2) means actual cost would result in the imposition of unreasonable administrative burdens on Mountain State Ford.  Petitioner acknowledges that it is not impossible for Mountain State Ford to use actual cost, and not replacement cost, in valuing its parts inventory.  In fact, Mr. Hommer, petitioner's expert on computerized inventory-tracking systems, admitted that the reason why there is no inventory recordkeeping system currently available in the automobile and truck dealer industry that uses actual cost in that valuation process is because there has been no demand for such a system in that industry.  Moreover, when Mountain State Ford adopted the LIFO method, Mountain State Ford made no attempt to determine whether it could have modified its perpetual inventory recordkeeping system so that it could have used invoice prices, i.e., actual cost, in valuing its parts inventory.  Nor did it determine whether it could have created a new inventory recordkeeping system that could have used invoice prices or actual cost in that valuation process.  In fact, when questioned by this Court as to why Mountain State Ford continued to use replacement cost, and did not use invoice prices or actual cost after it elected the LIFO method as of 1980, Eugene Peter O'Meara, Jr., testified that replacement cost had been utilized by Mountain State Ford previously and that Mountain State Ford did not consider using other than replacement cost when it elected the LIFO method.

To support his position that Mountain State Ford's method of using replacement cost to determine the current-year cost of its parts pool qualifies as any other proper method under section 1.472-8(e)(2)(ii)(d), Income Tax Regs., which in his view does not require the use of actual cost, petitioner contends (1) that Mountain State Ford elected in the Form 970 to use any other proper method in determining that current-year cost[13] and (2) that Mountain State Ford's use of replacement cost qualifies as such a method.  We disagree on both counts.  Mountain State Ford did not elect in the Form 970 to use any other proper method.  Instead, Mountain State Ford elected in that form to "determine the cost of * * * [parts] in the closing inventory" on the basis of "most recent purchases".  On the record before us, we find that Mountain State Ford elected to determine the current-year cost of its parts pool pursuant to the most recent purchases method described in section 1.472-8(e)(2)(ii)(a),

---

[13] In support of his position that Mountain State Ford elected in the Form 970 to use any other proper method, petitioner points out that Mountain State Ford "attached to the Form 970 a description of its method that clearly indicated * * * [that Mountain State Ford] was basing its index of computations on Ford's latest weekly price lists for parts".  We note initially that Mountain State Ford used replacement cost (viz., the prices reflected in the respective manufacturers' computerized price update tapes in effect as of the date of Mountain State Ford's physical inventory) in determining the current-year cost of its parts pool; it did not use all of the various "latest weekly price lists" to which Mountain State Ford referred in the Form 970 and which it indicated in that form it intended to use in calculating its price indices under its link-chain method.  It is also noteworthy that in the Form 970 Mountain State Ford stated that it intended to take inventory "at actual cost regardless of market value".

Income Tax Regs. That regulation requires such cost to be determined by "reference to the actual cost of the goods most recently purchased". Sec. 1.472-8(e)(2)(ii)(a), Income Tax Regs. Mountain State Ford did not request, and did not receive, the permission of the Commissioner to use a method different from the most recent purchases method that it elected in the Form 970. See sec. 472(e). We conclude that Mountain State Ford was precluded in determining the current-year cost of its parts pool from using a method other than the most recent purchases method which it elected in the Form 970 that it filed with its 1980 return.

Even if, as petitioner contends, Mountain State Ford had elected in the Form 970 to use any other proper method under section 1.472-8(e)(2)(ii)(d), Income Tax Regs., that method must be a proper method and must, in the opinion of the Commissioner, clearly reflect income. Respondent determined that Mountain State Ford's method of using replacement cost in determining the current-year cost of its parts pool was not a proper method and does not clearly reflect income because section 472(b)(2) requires that Mountain State Ford calculate such current-year cost by using actual cost, which in this case is the invoice prices. Petitioner contends that respondent abused respondent's discretion in making that determination. Petitioner asserts:

> An examination of * * * [section 1.472-8(e)(2)(ii),
> Income Tax Regs.] indicates that whereas the earliest
> and latest acquisitions cost methods (Treas. Reg. §§
> 1.472-8(e)(2)(ii)(a) & (b)) are described in terms of
> actual cost, this term is not used in describing either

the average acquisitions cost method or the so-called "other" method that * * * [Mountain State Ford] is using. Accordingly, the respondent's interpretation of the regulations imports into Treas. Reg. § 1.472-8(e)(2)(ii)(d) a requirement that does not exist in the regulations. For example, under the average acquisitions cost method described in Treas. Reg. § 1.472-8(e)(2)(ii)(c), the unit cost assigned would often not be the <u>actual</u> cost of <u>any</u> units; for example, where half the units acquired during the year were acquired at a cost of $10 and half were acquired at a cost of $11, the unit cost determined under the average cost method, $10.50, is not the <u>actual</u> cost of <u>any</u> units.

As petitioner acknowledges, the determination of the current-year cost of items making up a pool must be made (1) under the most recent purchases method under section 1.472-8(e)(2)(ii)(<u>a</u>), Income Tax Regs., by "reference to the actual cost of the goods most recently purchased or produced", and (2) under the earliest acquisition method under section 1.472-8(e)(2)(ii)(<u>b</u>), Income Tax Regs., by "reference to the actual cost of the goods purchased or produced during the taxable year in the order of acquisition". We believe that those respective regulations mandate that actual cost be used because of the requirement in section 472(b)(2) that goods with respect to which a taxpayer elected the LIFO method be inventoried at cost; i.e., actual cost. Section 1.472-8(e)(2)(ii)(<u>c</u>), Income Tax Regs., requires a taxpayer electing the average unit cost method described therein to divide the aggregate cost of all the goods purchased or produced throughout the taxable year, which petitioner does not dispute, and we conclude, means the aggregate actual cost of such goods, by the total number of units so purchased or produced in order to arrive at an average unit cost.

Although, as petitioner points out, application of the average unit cost method under section 1.472-8(e)(2)(ii)(c), Income Tax Regs., might not result in assigning a unit cost equal to the actual cost of any units purchased or produced during the taxable year, the determination of the current-year cost of items making up a pool under that regulation is required to be made on the basis of, or by reference to, the actual cost of all goods purchased or produced during the taxable year.  That regulation thus complies with the mandate of section 472(b)(2) that actual cost be used.

As we have just explained, each of the methods prescribed in section 1.472-8(e)(2)(ii)(a), (b), and (c), Income Tax Regs., relating to the dollar-value LIFO method mandates, as required by section 472(b)(2), that the determination of the current-year cost of items making up a pool be made on the basis of, or by reference to, actual cost.[14]  We conclude that, in order for a

---

[14]  Pursuant to the requirement of sec. 472(b)(2), each of the methods prescribed in sec. 1.472-2(d)(1)(i)(a), (b), and (c), Income Tax Regs., relating to the specific-goods LIFO method also mandates that the cost of goods on hand as of the close of the taxable year with respect to which the taxpayer elected the LIFO method and which are in excess of what were on hand as of the beginning of the taxable year be determined on the basis of, or by reference to, the actual cost of certain or all of the goods purchased or produced during the taxable year, regardless of identification with specific invoices and regardless of specific cost accounting records.  See sec. 1.472-2(d), Income Tax Regs.
  Consistent with sec. 472(b)(2), sec. 472(b)(3) and the regulations thereunder specifically require that goods with respect to which a taxpayer elected the LIFO method that are included in the opening inventory of the taxable year for which the LIFO method is first used are to be considered as having been acquired at the same time and at a unit cost determined by reference to the
(continued...)

method to qualify under section 1.472-8(e)(2)(ii)(d), Income Tax
Regs., as any other proper method which clearly reflects income,
the method must, as required by section 472(b)(2), determine the
current-year cost of items making up a pool on the basis of, or
by reference to, actual cost (or in certain instances a reason-
able approximation of such cost). Assuming arguendo that Moun-
tain State Ford had elected to use any other proper method under
section 1.472-8(e)(2)(ii)(d), Income Tax Regs., in the Form 970
that it filed with its 1980 return, which we have found it did
not, petitioner has not persuaded us that the method which
Mountain State Ford used to determine that current-year cost,
which was based on replacement cost and not actual cost, is a
proper method that clearly reflects income under that regula-
tion.[15]

In further support of his position that Mountain State
Ford's method of using replacement cost, and not actual cost, in

_____

[14](...continued)
aggregate actual cost of such goods (i.e., by dividing such
actual cost by the number of units on hand). Sec. 1.472-2(c),
Income Tax Regs. The aggregate actual cost is to be determined
pursuant to the inventory method used by the taxpayer under the
regulations applicable to the taxable year preceding the taxable
year for which the election of the LIFO method is made, with the
exception that restoration is to be made with respect to any
write-down to market values resulting from the pricing of former
inventories. Id.

[15] In using replacement cost to determine current-year cost
under sec. 1.472-8(e)(2)(ii), Income Tax Regs., Mountain State
Ford was not attempting to, and did not, determine or approximate
the actual cost (i.e., the invoice prices) of the parts that it
purchased. It would have been sheer happenstance if the replace-
ment cost that Mountain State Ford used equaled or reasonably
approximated such actual cost.

valuing its parts inventory under the dollar-value LIFO method is proper, petitioner asserts:

> ever since this Court's decision in Hutzler Brothers v. Commissioner, 8 T.C. 14 (1947), taxpayers have been permitted to use the retail method in conjunction with the dollar-value LIFO method despite the fact that under the retail method a taxpayer does not compute the actual cost of the items in its inventories under any of the three inventory ordering conventions.

We turn first to petitioner's suggestion in the foregoing excerpt from his brief that respondent is arguing in this case that it is necessary under the dollar-value, link-chain LIFO method which Mountain State Ford elected to determine the actual cost of each unit inventoried. We do not understand respondent to be taking that position. To the contrary, as section 1.472-8(e)(2)(ii), Income Tax Regs., makes clear, the requirement in section 472(b)(2) that goods for which a taxpayer elected the LIFO method be inventoried "at" cost does not mean that, in determining the current-year cost of items making up a pool, it is necessary to determine the actual cost of each unit inventoried.[16]

Turning now to petitioner's argument about the retail method, petitioner is correct that the retail method is permitted to be used in conjunction with the dollar-value LIFO method, Hutzler Bros. Co. v. Commissioner, 8 T.C. 14 (1947); sec. 1.472-1(k), Income Tax Regs.; sec. 1.472-8(e)(1), Income Tax Regs., and that that method "does not compute the actual cost of the items

---

[16]  Nor is it necessary to do so under the specific-goods LIFO method.  See sec. 1.472-2(d), Income Tax Regs.

in" a taxpayer's inventory. However, the actual cost reasonably approximated under the retail method, which is described in section 1.471-8, Income Tax Regs., satisfies the definition of the term "cost" in section 1.471-3(d), Income Tax Regs. Consequently, the requirement in section 472(b)(2) that goods for which a taxpayer elected the LIFO method be inventoried at "cost", which we have held has the same meaning accorded the term "cost" in section 1.471-3, Income Tax Regs., is satisfied by a retailer who elects the dollar-value LIFO method, determines a reasonable approximation of actual cost under the retail method, and, inter alia, complies with section 1.472-1(k), Income Tax Regs., and section 1.472-8(e)(1), Income Tax Regs. We reject petitioner's argument that the use of the retail method in conjunction with the dollar-value LIFO method means that Mountain State Ford's method of using replacement cost under the dollar-value LIFO method is permitted by section 472 and the regulations thereunder.[17]

_____

[17] We also reject petitioner's position that the use of the standard cost method in conjunction with the dollar-value LIFO method supports his position that Mountain State Ford's method of using replacement cost under the dollar-value LIFO method is permitted under sec. 472 and the regulations thereunder. In this regard, petitioner states:

> taxpayers have been consistently permitted to use the standard cost method under both the full absorption method and the uniform capitalization method, in conjunction with the dollar-value LIFO method, despite the fact that standard costs are merely a predetermined estimate of the taxpayer's actual costs. Treas. Reg. §§ 1.471-11(d)(3); 1.263A-1(f)(3)(ii)(A).

(continued...)

We hold that Mountain State Ford's method of using replace-
ment cost in determining the current-year cost of its parts pool
under the dollar-value LIFO method contravenes the requirements
of section 472(b)(2), section 1.472-2(b), Income Tax Regs., and
section 1.472-8(e)(2)(ii), Income Tax Regs.  We further hold

---

[17](...continued)
In advancing the foregoing argument, petitioner fails to mention
that, in determining the cost of inventoried goods, a taxpayer
subject to the inventory accounting method is and/or was ex-
pressly made subject by sec. 1.471-3, Income Tax Regs., to
(1) sec. 1.263A-1, Income Tax Regs., on or after Jan. 1, 1994;
(2) sec. 1.263A-1T, Temporary Income Tax Regs., 52 Fed. Reg.
10060 (Mar. 30, 1987), for taxable years beginning on or after
Dec. 31, 1986, until Dec. 31, 1993; and (3) sec. 1.471-11, Income
Tax Regs., for taxable years beginning on or before Dec. 31,
1986.  All of those regulations allow or allowed the use of the
standard cost method.  Under that method, a taxpayer may allocate
an appropriate amount of direct and indirect costs to property
that such taxpayer produces through the use of preestablished
standard allowances, without reference to costs actually incurred
during the taxable year.  See sec. 1.263A-1(f)(3)(ii)(A), Income
Tax Regs.  We have held that the term "cost" in sec. 472(b)(2)
has the same meaning accorded to the term "cost" in sec. 1.471-3,
Income Tax Regs.  Sec. 472(b)(2) thus permits the use of the
standard cost method in inventorying goods at cost under the LIFO
method.
    In advancing his argument about the standard cost method,
petitioner also fails to mention that the regulations in effect
at different times describing the standard cost method (viz.,
sec. 1.263A-1(f)(3)(ii), Income Tax Regs., sec. 1.263A-
1T(b)(3)(iii)(D), Temporary Income Tax Regs., 52 Fed. Reg. 10065
(Mar. 30, 1987), and sec. 1.471-11(d)(3), Income Tax Regs.)
require and/or required a taxpayer to "reallocate to the goods in
ending inventory a pro rata portion" of the variance between the
predetermined estimate and actual cost unless such variance is
not "significant" in amount.  If that variance is not "signifi-
cant" in amount, it does not have to be allocated to the tax-
payer's goods in ending inventory unless such an allocation is
made in the taxpayer's financial reports.  See sec. 1.263A-
1(f)(3)(ii)(B), Income Tax Regs.; sec. 1.263A-1T(b)(3)(iii)(D)
(2), Temporary Income Tax Regs., supra; sec. 1.471-11(d)(3)(ii),
Income Tax Regs.

that, consequently, that method does not clearly reflect income. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522 (1979).

Petitioner argues that if we were to find, as we have, that Mountain State Ford's method of using replacement cost in valuing its parts inventory under the LIFO method does not clearly reflect income, that method should nonetheless be sustained because respondent changed that method to an impermissible method which does not clearly reflect income. In support of his position, petitioner cites Dayton Hudson Corp. & Subs. v. Commissioner, 153 F.3d 660, 664 (8th Cir. 1998), revg. T.C. Memo. 1997-260; Harden v. Commissioner, 223 F.2d at 421; Prabel v. Commissioner, 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3d Cir. 1989); and Golden Gate Litho v. Commissioner, T.C. Memo. 1998-184. Relying on those cases, petitioner argues:

> The respondent is unwilling to admit the consequences of the adjustment he seeks in this case. The respondent claims he "has not replaced one impermissible method with another." The respondent in his brief refuses to admit that his adjustment changes * * * [Mountain State Ford's] inventory value from a dollar-value LIFO value determined using replacement costs as current-year costs to an inventory value that is in its entirety equal to current replacement costs. At trial, however, the respondent admitted that this was the case. * * * it is internally inconsistent for the respondent to claim that a LIFO inventory value based on using replacement costs as current-year costs does not clearly reflect income while maintaining that the inventory must be adjusted to a value that is in its entirety equal to current replacement costs. If the respondent were correct in his claim that the use of replacement costs to determine current-year costs under dollar-value LIFO produces an impermissible inventory value, then an inventory value based entirely on current replacement costs would surely be even more impermissible.

Respondent counters that respondent has not terminated Mountain State Ford's elections to value its parts inventory under the dollar-value, link-chain LIFO method and to use the most recent purchases method in determining the current-year cost of its parts pool. According to respondent, respondent has merely required Mountain State Ford to conform to the elections that it made in the Form 970 which it filed with its 1980 tax return. Respondent states on brief:

> All respondent has done in this case is to determine that * * * [Mountain State Ford's] LIFO reserve was incorrectly calculated because * * * [Mountain State Ford] used replacement cost. * * * [Mountain State Ford] did not attempt to reconstruct or recalculate the corrected reserve amount or provide evidence from which an estimate could be made. Because of this, respondent was unable to determine the amount of the corrected reserve and had to restore the reserve to income.

We agree with respondent. In contradistinction to the cases on which petitioner relies, in the instant case Mountain State Ford did not comply with the requirement of section 1.472-2(h), Income Tax Regs., that it maintain detailed inventory records "as will enable the district director readily to verify * * * [Mountain State Ford's] inventory computations as well as * * * [its] compliance with the requirements of section 472" and the regulations thereunder. Consequently, Mountain State Ford did not have, and did not provide to respondent, the records that were necessary in order to calculate for the period 1980 through 1991 (1) the LIFO and non-LIFO value of its parts inventory and (2) its LIFO reserve on the basis of invoice prices or a cost other than replacement cost.

We do not understand the statements of respondent's counsel during his opening statement at trial to be a concession by respondent that respondent placed Mountain State Ford on a non-LIFO method that utilizes replacement cost, and we reject petitioner's contention to the contrary. Even if respondent's counsel had made such a concession during his opening statement at trial, we would not consider it to be a concession that binds respondent. That is because, inter alia, any such concession would have been contrary to respondent's position as set forth in paragraph 51 of the stipulation of facts, which was made part of the record in this case immediately before the Court allowed counsel for the parties to make opening statements. The position of respondent in paragraph 51 of the stipulation of facts is totally consistent with the notice. In the notice, respondent did not terminate Mountain State Ford's elections to value its parts inventory under the dollar-value, link-chain LIFO method and to use the most recent purchases method in order to determine the current-year cost of its parts pool.[18] Mountain State Ford remains on those methods and cannot account for its parts inventory on any other methods without first receiving permission from

---

[18] Pursuant to sec. 3.01(c), Rev. Proc. 79-23, 1979-1 C.B. 564, "Failure by the taxpayer to value its LIFO inventory at cost for Federal income tax purposes, for the year preceding the LIFO election, the year of the LIFO election, and all subsequent taxable years" may warrant the termination of that taxpayer's LIFO election. However, such termination is within the discretion of respondent and is not mandatory. See Consolidated Manufacturing, Inc. v. Commissioner, 111 T.C. 1, 38 (1998). In the present case, respondent chose not to exercise that discretion and did not terminate Mountain State Ford's LIFO election.

the Commissioner.  See sec. 472(e); sec. 1.472-5, Income Tax Regs.

On the record before us, we find that respondent did not place Mountain State Ford on an improper method of inventory accounting in the notice.  We further find that respondent did not abuse respondent's discretion in making the adjustment at issue in the notice.  Consequently, we sustain that adjustment.[19]

To reflect the foregoing and the concessions of the parties,

Decision will be entered

under Rule 155.

---

[19] We have considered all of the arguments and contentions of petitioner that are not addressed herein and find them to be without merit or irrelevant.